## NANCY C. HARDISON v. J. M. BILLINGTON.

1. SEPARATE ESTATE. *Power of disposition.* If, without any previous agreement between the husband and wife as to the disposition of the proceeds of sale, the wife's dower land be sold, and the notes for the purchase money be made payable to both, the husband may reduce them to possession by collection, assignment, or other valid disposition, the wife's right being only to a settlement, or of survivorship before such disposition. And if, after the sale, a trust in the notes to the wife's separate use be created by agreement between the husband and wife, she may, neverthless, give them to her husband if there is no restraint upon her power of disposition.

2. SAME. *Trust by parol.* It requires express terms to impose upon property the character of separate estate, and to create a valid trust by parol the language used must amount to a clear and explicit declaration of trust.

3. SAME. *Evidence.* The testimony of the wife alone, as against third persons, will not be sufficient to change the legal effect of instruments of writing formally executed, and *a fortiori,* if her own testimony shows that her recollection is not reliable.

Hardison v. Billington.

4. EXEMPTION. *Widow's year's allowance. Conversion by administrator.* Exempt articles and effects set apart to a widow for her year's support vest in her, and if the administrator converts any of the articles, her remedy is against him as an individual.

FROM MARSHALL.

Appeal from the Chancery Court at Lewisburg. JOHN V. WRIGHT, Sp. Ch.

McCLURE & SMITHSON, T. M. & T. W. JONES. and —— MURRAY for complainants.

LEWIS BROS. and W. S. RAINEY for defendants.

COOPER, J., delivered the opinion of the court.

On April 6, 1869, George W. Harmon died intestate, leaving the complainant his widow. Fred Harmon was appointed administrator of the intestate's estate, and qualified as such, the complainant becoming surety on his administration bond, dated June 7, 1869. The complainant was in possession of the personal property exempt from execution, and on June 26, 1869, her year's allowance was set apart to her in specific articles by commissioners appointed for the purpose by the county court. During the same year dower was allotted to her in the realty. On June 3, 1872, the county court ordered an execution to issue against Fred Harmon as administrator, and complainant as his surety for $315.59, the balance found against the administrator on settlement. Afterwards, the date not being shown, but probably during that year, Fred Harmon either resigned or was removed as adminis-

trator, and the defendant, Billington, was appointed administrator *de bonis non* in his place. On May 20, 1872, complainant intermarried with Ezra Hardison. On November 26, 1872, she and her husband join in a deed conveying her dower estate in the Harmon lands to J. M. Billington, guardian of W. R. Shires, for a recited consideration of $1,500 paid, "the receipt of which is acknowledged." The consideration was in fact $1,500, secured by two notes of J. M. Billington as guardian of W. R. Shires, one due December 25, 1872, for $600, and the other due December 25, 1873, for $900. These notes were made payable to Ezra Hardison and Nancy C. Hardison. The privy examination of the complainant was taken to the deed on February 14, 1873, and the acknowledgment of the husband was made on the 18th of the following month. The notes were surrendered by the husband to the defendant as guardian in satisfaction of about the same amount of indebtedness due by the husband to defendant as guardian of W. R. Shires, and were allowed him as credits in his settlement as guardian on December 29, 1873. Shortly after the conveyance of the land, Hardison and wife moved from it to another place, about a mile distant, and W. R. Shires, then about nineteen years of age, went into possession, and has remained in possession ever since. Ezra Hardison, the husband, died it seems in 1876, although the date does not appear in the record. On May 7, 1878, this bill was filed by Nancy C. Hardison (who was then pressed by execution on the recovery against her as surety of Fred

Harmon as administrator), against J. M. Billington individually, and as administrator *de bonis non* of complainant's first husband. The object of the bill is to charge Billington individually with the proceeds of the notes given for the dower land, and to recover from him as administrator *de bonis non* the value of exempt property and of property set apart to her for her year's allowance as the widow of George W. Harmon, her first husband, alleged to have been sold, or not delivered to her by Fred Harmon, the first administrator. The chancellor granted the relief sought, and the Referees report in favor of affirmance. The defendant excepts.

It is conceded by the complainant's counsel that the sale by Hardison and the complainant, his wife, of her dower estate in the Harmon land was valid. And it is not insisted by them that there is any proof in the record of any agreement between the husband and wife previous to the contract of sale and execution of the notes, that the proceeds of the sale were to be invested for the wife's benefit in a particular manner, or otherwise settled to her sole and separate use. What they do contend for is, that by reason of what took place, when the purchase notes were executed, between the husband and wife in the presence of the defendant, the notes were fixed with a trust to her separate use which bound the defendant.

The law regulating the wife's rights to the proceeds of the sale of her realty may be considered as well settled in this State. If the wife consents to a sale of her real estate, and joins her husband in

a conveyance of it, made according to the forms of law, without an understanding or agreement that the proceeds are to be held or vested for her use, or that she is to be remunerated out of the estate of her husband, all her interest in the estate is gone, and her husband holds the consideration for which it was sold in his own absolute right, discharged of any claim of hers paramount to his: *Chester* v. *Greer,* 5 Hum., 25; *Ex-parte Yarborough,* 1 Swan, 202. It is, however, competent for the wife to agree with her husband that he shall sell her estate in lands and invest the proceeds for her benefit, and she may prove the fact by parol testimony, in which case, if the husband take the title to the property bought with the money in his own name, a resulting trust will be created in the property bought in her favor: *Pritchard* v. *Wallace,* 4 Sneed, 405; *McClure* v. *Doak,* 6 Bax., 364. It requires express terms to impose upon property the character of separate estate: *Murdock* v. *Railroad Co.,* 7 Baxt, 557, 573. And to create a valid trust by parol, it is essential that the expressions used should amount to a clear and explicit declaration of trust. The subject-matter as well as the object of the trust must be pointed out with certainty: *Harris* v. *Union Bank,* 1 Cold., 153. And for obvious reasons of public policy, the testimony of the husband and wife, and *a fortiori,* of the wife alone will not be sufficient to overturn the legal effect of instruments of writing executed with the formalities required by the law: *Grotenkemper* v. *Carver,* 9 Lea, 280, 287; *Page* v. *Gillentine,* 6 Lea, 240.

If, without any previous agreement between the husband and wife as to the disposition of the proceeds of sale, the wife's land be sold and the notes for the purchase money be made payable to both, the husband may reduce them to possession by collection, assignment or other valid disposition, and the wife's right is only to a settlement or that of survivorship before such disposition: *McMillan* v. *Mason,* 5 Cold., 263; *Cox* v. *Scott,* 9 Baxt., 305; *Pile* v. *Pile,* 6 Lea, 508. And even if a trust to her separate use be created between the husband and wife as to such notes, she may nevertheless give them to the husband, or anybody else, if there is no restraint upon her power of disposition: *Jackson* v. *Rutledge,* 3 Lea, 626, 628; *Scobey* v. *Waters,* 10 Lea, 551, 563.

The bill alleges that at the time the notes for the land were executed, "it was distinctly understood and stated that such notes were her own private property, and that as such she took charge, control and custody of the notes in the presence of her husband and the defendant, and placed the same with her own private papers in her own private drawer." It is then alleged that the husband, at the instance of the defendant, who was his son-in-law, got possession of the notes without her knowledge or consent, and defendant has never paid her any part thereof. The defendant denies these charges, and testifies that the very object of the sale was to enable the husband to pay his indebtedness to defendant as guardian of W. R. Shires, a fact well known to complainant, and agreed to by her. The only testimony to sup-

port the averments of the bill is the testimony of
the complainant herself. All that she says directly
on the point is contained in these words of her depo-
sition: "When Mr. Billington wrote the notes * *
he read them over to me, and laid them on the table.
Mr. Hardison then read them, and folded them up,
and laid them on the table, and said to me: 'Old
lady, them are your notes, I have no interest in
them,' for me to take them and put them away. I
took the notes and started to the drawer with them.
I remarked that if Mr. Hardison and me fell out, I
would have to go to the woods; I had no home.
* * I put them away." She then says she had a
private drawer, of which she kept the key, and put
the notes in the drawer, whence they were taken
without her knowledge. But she immediately adds:
"Mr. Hardison kept his pocket-book in the same
drawer, and frequently got the key."

The only other testimony introduced by the com-
plainant upon the subject of what took place on the
occasion of the execution of the notes is that of
Robert Hardison, a son of the husband by a former
wife. He says he was called in by his father to
witness a paper writing, which the papers themselves
show was the deed to the land. "I remember," he
says, that my father handed the papers that I signed
to my step-mother, and said to her the papers are
yours, not mine. She took the papers, and put it
away, and said something about going to the woods."
This testimony, it is obvious, tends to support the
defendant's statement that the deed was handed to the

wife in order that she might have her privy exami-
nation taken to its execution, which was not done
until the 14th of the following February, and that
the husband took the notes. The remark of the wife
about going to the woods is consistent with this view,
but seems a little out of place where the sale was
voluntarily made, and the proceeds were to be held
by the wife.

The complainant is an illiterate old woman, whose
testimony must be taken with many grains of allow-
ance. She says the deed was signed by her alone,
and not by her husband. The deed shows that it was
signed by both. She says she sold the land to Bil-
lington as administrator *de bonis non* of her first hus-
band. The conveyance is to him as guardian of
Shires. She says the notes were signed by Biilington
as an individual. They are signed by him as guar-
dian of Shires. She says Robert Hardison signed the
notes as a witness, and did not witness the deed.
The papers establish exactly the reverse. She says
the deed and notes were executed at different
times, the other proof establishing the contrary. She
says that she saw the notes in the drawer six or
eight weeks before her husband's death in 1876, when
the testimony shows that they were allowed as a credit
to Billington as guardian in December, 1873. She
says, when the administrator of her husband came for
his papers, she asked him to look among them for
the notes, while the administrator testifies she said
nothing to him on the subject.

Very little reliance, it is obvious, can be placed

23—VOL. 14.

on her recollection, and her own testimony to the main fact is clouded by the doubt thus produced on the reliability of her memory after the lapse of nearly six years. But we think her testimony, if true, wholly insufficient to charge the defendant with any trust in relation to the notes. It is almost certain that the sale was made expressly for the purpose of enabling the husband to pay his debt to the defend- ant as guardian, the form of executing notes being resorted to for the purpose of giving time to take her privy examination, and also to make some pro- vision for the payment of her liability as the surety of Fred Harmon. Be this as it may, the proofs falls far short of the " express terms " and " clear and explicit declaration of trust " essential to impose upon property the character of separate estate, and to de- prive the husband of the right to dispose of his wife's choses in action. And the proof wholly fails to make out a case of fraudulent collusion, or of any collusion at all between the husband and the defendant.

The bill charges that when the notes in contro- versy were executed, complainant told the defendant he might apply any money due her on the notes to the payment of her liability as surety of Fred Har- mon, and that the defendant promised and agreed to do so. The defendant denies the charge, and says that the husband was requested by the wife to apply so much of the proceeds of the notes as might be required to pay that debt, which he promised to do; that defendant about the same time bought from the husband another small tract of land; that when the

notes in question were taken up by defendant as guardian, he agreed with the husband to give his note for the amount necessary to pay the balance of the Fred Harmon debt, about $290, in part consideration for the small tract of land bought by the defendant as an individual, which note was to be kept and used in compliance with the wife's request; that the note was given accordingly, but the husband afterwards insisted that the money should be paid to him; that defendant objected until his objections led to an angry feeling on the part of the husband, who was defendant's father-in-law, which was only adjusted through the aid of a friend, by defendant agreeing to pay the debt. The statements of Billington about this note must have largely influenced the findings of the chancellor and the Referees. The proof does not establish the charge of the bill, and does tend to sustain the statements of the defendant. The husband did, no doubt, promise to pay the debt, the subsequent pressure of which led to the filing of the bill. But there is no sufficient testimony to charge defendant therewith.

The proof shows that complainant was in possession of the exempt property of her first husband's estate, and that her year's allowance was set apart to her in specific articles. The title to the exempted articles vested in her at her husband's death, and the title to the articles set apart upon confirmation of the commissioner's report: 9 Hum., 171; 4 Cold., 363. There is no proof that the husband's estate received the benefit of a sale of any of these effects.

The estate, moreover, has long since been protected by the statute of limitation.

And . if complainant allowed Fred Harmon to appro-priate any of the effects, the title to which was vested in her by law, her remedy is against him, and not her husband's estate : *Ourd* v. *Ourd*, 9 Hum., 171; *Bayless* v. *Bayless*, 4 Cold., 363.

The exceptions to the Referees' report must be sustained, . the chancellor's decree reversed, and the bill ·dismissed with costs.