DETROIT NATIONAL BANK *v.* BLODGETT.

DURESS—PARENT AND CHILD.

Two sons resisted, on the ground of duress, the foreclosure of mortgages executed by them to secure a loan made to their father of money used by him to improve their property. It was shown on behalf of one of the sons that he signed a mortgage four days after becoming of age, at the command of his father, who was a violent man, of whom he stood in great fear; that about a year later he executed a new mortgage in place of the first, to obtain for his father a five years' extension on the indebtedness; and that he was obliged to sign the mortgages in order "to keep peace in the family." On behalf of the other son it appeared that he was dependent upon his father for the support of himself and his wife, and that his father had threatened to turn them out of doors unless he signed the mortgage; that he consented to sign only after taking the advice of his attorney that the instrument could be set aside.

*Held*, that there was no such duress shown as would avoid the mortgages.

ON APPLICATION FOR REHEARING.

EQUITY—INHERENT POWERS—QUESTIONS OF FACT—JURY.
　The legislature cannot abridge the right of courts of chancery to pass upon questions of fact without the intervention of a jury. *Brown* v. *Kalamazoo Circuit Judge*, 75 Mich. 274, approved and followed.

Appeal from Wayne; Steere, J., presiding.   Submitted October 12, 1897.   Decided December 7, 1897.   Application for rehearing denied January 25, 1898.

Bill by the Detroit National Bank against Cornelia H. Blodgett and others to foreclose certain mortgages.   From a decree for complainant, defendants Charles G. and Ralph C. Blodgett appeal.   Affirmed.

*Henry A. Harmon* (*John D. Conely*, of counsel), for complainant.

*Hamilton G. Howard* and *C. J. O'Flynn*, for appellants.

LONG, C. J.   This proceeding was commenced for the foreclosure of three mortgages.   Complainant's claim is that Charles C. Blodgett was the owner of certain property in Detroit, known as "Lots 1, 2, and 3 on the north side of Franklin street," and "Lots 1, 2, and 3 on the south side of Woodbridge street."   His wife, Cornelia, had an estate for her own life in other property in Detroit, known as "Lots 29, 30, 36, and 37 of the Louis Moran Farm."   The children of Mr. and Mrs. Blodgett, namely, Elma Louise Smith, May N. Blodgett, Alice Blodgett Craig, Charles G. Blodgett, Ralph C. Blodgett, and Adelaide P. Blodgett, held the remainder in fee, each owning an undivided one-sixth.   The title of Mrs. Blodgett and the children to the property owned by them came from the will of Solomon Gardner, the father of Mrs. Blodgett.

He died in 1878.    The place had been his homestead, and it became the home of Mr. and Mrs. Blodgett and their children after the death of Mr. Gardner.

As early as 1888, Mr. Blodgett formed an intention to tear down the buildings that were then upon the place, and to erect thereon rentable buildings called "flats," and to be known as the "Blodgett Terrace."    At this time but three of the Blodgett children had arrived at full age. They were Elma Louise Blodgett, now Mrs. Smith, May N. Blodgett, and Alice Blodgett, now Alice Blodgett Craig.    To accomplish the building of the terrace, Mr. Blodgett borrowed money from the complainant, the Detroit National Bank, and from time to time gave to complainant his notes at four months for the money so borrowed.    The payment of these notes was guaranteed by Mr. C. H. Buhl; and two mortgages were given to him to protect him because of such guaranty.    Both mortgages bore date April 30, 1888.    One mortgage was on the property owned by Mr. Blodgett, as heretofore stated.    This mortgage was signed by Mr. and Mrs. Blodgett.    The other mortgage was on the property owned by Mrs. Blodgett and the children.    This was signed by her and the three children who had then become of full age, namely, Elma, May, and Alice.    The money borrowed was expended in the building of the Blodgett Terrace.    This terrace was wholly on the property owned by Mrs. Blodgett and the children, and the expectation was that the investment was for the benefit of the family. At the outset the venture was supposed to be a good one in a business sense, though it did not turn out to be so.

Charles, the fourth child, became of full age on the 13th day of February, 1891.    In pursuance of the family understanding, and on the 17th of that month, four days after Charles had become of age, a new mortgage was given, signed by Charles alone.    The mortgage from Charles covered all the mortgagor's right, title, and interest in and to the terrace property.    Its condition was as follows:

"These presents are upon the express condition that if Charles C. Blodgett, father of the party of the first part, shall pay at maturity all notes made by him, and indorsed by said Christian H. Buhl, and held by the Detroit National Bank, or any and all renewals of notes so made, indorsed, and held, or which may be hereafter so made, indorsed, and held, and save the said Buhl harmless from all loss or damage by reason of an agreement dated April 30, 1888, between said Buhl and the said bank, wherein he guarantees to said bank the payment of all notes discounted by said bank for said Charles C. Blodgett, it being understood that the notes now held by said bank so made and indorsed were given for moneys borrowed to erect the building now on the aforesaid premises, in consequence whereof I have been benefited, and the liability for which moneys I should share with Cornelia H. Blodgett, Elma Louise Blodgett, May N. Blodgett, and Alice Blodgett Craig, who have given a mortgage on said premises dated April 30, 1888, to secure the payment of said notes, and to save said Buhl harmless on account thereof, the consideration moving to me being the benefit my estate has derived from the use made of said moneys, and, further, the agreement of said Buhl and said bank to grant reasonable renewals of said notes, then these presents and said notes shall cease, and be null and void."

The agreement referred to in the foregoing condition was made contemporaneously with the making of the two mortgages first herein mentioned, namely, the one signed by Mr. and Mrs. Blodgett and the one signed by Mrs. Blodgett and the three older children.

About a year after the giving of the mortgage by Charles, and on the 28th day of January, 1892, the indebtedness of Mr. Blodgett to the bank had reached the sum of $100,000, whereupon, and on that day, Mr. Blodgett, Mrs. Blodgett, and the four older children, Elma, May, Alice, and Charles G., gave their bond for that sum to complainant; principal payable on or before five years from its date, with interest at 6 per cent. per annum, payable monthly. At the same time two new mortgages were given. One was on the property owned by Mr. Blodgett, and was signed by Mr. and Mrs. Blodgett; the other was on the property of Mrs. Blodgett and the

children, and was signed by her and the four elder children mentioned. The three former mortgages, including the one given by Charles, were discharged.

Ralph C. Blodgett, the fifth child, became of full age January 9, 1894. He was married on April 30, 1890, soon after he became 17. Shortly after he became of age, and on January 18, 1894, he gave to the bank a mortgage on the terrace property. At this time he was living at 234 Woodbridge street, on the opposite side of the street from the terrace. The rent of this house was paid by his father. The condition of this mortgage is as follows:

"*Provided, always,* and these presents are upon the express condition, that if Charles C. Blodgett, Cornelia H. Blodgett, Elma Louise Smith, May N. Blodgett, Alice Blodgett Craig, and Charles G. Blodgett, or either of them, shall pay or cause to be paid to said Detroit National Bank the sum of $100,000 on or before the expiration of five years from January 28, 1892, with interest thereon at the rate of six per cent. per annum, payable monthly, according to the terms of a certain bond executed by them bearing date January 28, 1892, and secured by mortgage executed by them, except said Charles C. Blodgett, bearing the same date, and recorded in Liber 298 of Mortgages, page 127, said bond and mortgage having been given to secure moneys loaned for and used in erecting the building on said lots hereinbefore described, and therefore used for the benefit of said Ralph C. Blodgett, as well as for the benefit of said mortgagors, for which reason the security of this mortgage is given, then these presents and said bond shall cease, and be null and void."

The payments were largely behind at the time this suit was begun, and there was unpaid at the time of taking the decree the amount stated therein. The bill was filed for the foreclosure of the three mortgages, namely, the two of January 28, 1892, and the one subsequently given by Ralph. Originally, Mr. Blodgett was a defendant. He died, and the suit was revived. Mr. Fred C. Harvey, his administrator, was made a party; so was Adelaide P. Blodgett, the sixth child of Mr. and Mrs. Blodgett. The bill was taken as confessed by all of the defendants

except Charles G.; Ralph, and his wife, Mary.    Mary was under age at the time she signed the mortgage.    This was conceded at the hearing, and it was consented by the complainant that the bill should be dismissed as to her.    The Portage Red Stone Company and John F. Ruhl were made parties under the subsequent incumbrance clause.    Adelaide P. Blodgett was made a party because of the interest derived by her upon the death of her father in the property which had been his, and her interest in the terrace property is exempted from the decree.

The contention of the defendant Charles G. Blodgett is that when he joined in the execution of the terrace mortgage, and the bond to which it is collateral, he was young and inexperienced, that he did not fully understand their contents, and that he executed them through fear of his father, and that they should therefore be set aside as to him.    Ralph C. Blodgett contends that when he and his wife executed the mortgage of January 18, 1894, they were then occupying a house the rent of which was paid by his father; that he and his wife were wholly dependent upon him for their house rent and board; that, before and directly after he became of age, his father practically forced him to execute the mortgage, and he feared that, if he refused to sign, his father would cease to pay the rent, or furnish a home and food for his family; that his father was a man of violent temper, and he did not wish to cross him; that under these circumstances he signed the mortgage.    His wife, in her answer, makes the same contention.    These defendants, Charles, Ralph, and Mary Blodgett, all contend that they received no actual benefit from the moneys mentioned in the mortgages.    Defendants introduced several witnesses, who testified that the elder Mr. Blodgett was a man of rough, coarse ways, of large size, with a heavy voice and violent temper, and of a domineering disposition, and much given to profanity and vileness of language.    They gave it as their opinion that his children would not dare to disobey or cross him.    In reference to the circumstances of signing the first mortgage, Charles testified:

"I was working for the First National Bank at that time [date of execution of mortgage], and I came home about 4 o'clock in the afternoon; and he [father] says, 'I want you to go down town with me.' And I supposed he wanted me to go down and hold the horse for him while he went in somewhere. So I got into the buggy, and we went down, and when he turned off Jefferson avenue he said, 'I want you to sign some papers.' Well, I said I didn't care to sign those papers. I said: 'You are not getting sufficient out of that thing to pay, and I don't see any reason why you should make us sign this thing, when in time it will all have to go anyway. It will be only a few years when it will be foreclosed.' 'Well,' he says, 'that is all right. I promised Mr. Buhl you would sign that thing, and you have got to sign it.' I was afraid to say anything to him, and I never talked backed to him at all, because I didn't dare to; and we got down. He hitched the horse in front of the post-office, and walked up, and I never said anything until I got to Mr. Harmon's office. Mr. Harmon went in the other room, and got the papers, and brought them out, and laid them on the table, and he says, 'You sign right here.'

"Q. Who said that?

"A. Mr. Harmon. And father said right after him, 'That's right, sign it right there.' But I says, 'Wait a moment; I would like to read this.' And he [father] said: 'There is no damn use in your trying to read this thing. You can't make head or tail of it.' Mr. Harmon says, 'That is right; let him read it,' and I picked it up, and started to read it. While I was there, he [father] got a little nervous-acting, and walked up and down the room, swinging his arms; and I could not make anything out of the paper; and I finally got disgusted, and threw it down on the table. He [father] says, 'Are you ready to sign it?' and I was thinking at the time whether I had better or not. Well, I thought the only thing to keep peace in the family was to sign it, and be done with it, so I did it, through fear of having an awful rumpus if I did not."

He also testified that he signed the second mortgage under coercion from his father. On cross-examination he stated that he knew this second mortgage was to take the place of the prior one, and that the second mortgage was to run five years, and that he told his father it was a

foolish arrangement. He also knew the amount was $100,000, and that the bank had agreed to postpone the payment for five years by the giving of this mortgage; and he stated, "The main reason I signed it was to keep peace in the family."

Ralph, after detailing what took place between himself and his father, his father's threats of turning himself and wife out of doors, says that he then consulted Mr. Howard (an attorney in Detroit); that he consulted him a number of times about signing the mortgage; and that Mr. Howard advised him to sign it for the sake of peace in the family, and told him that, if he did sign it, he (Howard) thereafter would have it set aside. Witness further testified, "I signed it altogether on Mr. Howard's advice." Both Charles and Ralph admit that they knew this money went into the building of the terrace, the title of which was in their mother and her children.

Prior to the time this testimony was given, the elder Blodgett had died. It appears, however, that he had obtained these moneys from the bank, and had expended them upon property belonging to his wife and children. It may have been, and undoubtedly was, an unwise undertaking, as it jeopardized the whole property, his own as well as that belonging to his wife and children. When he received the money, it was with the understanding that the children who were then under age would sign the mortgage when they became of age. When Charles came of age, he signed the first mortgage. The circumstances under which he claims to have signed it have been set out. He signed the second mortgage about a year later, when he was nearly 22 years of age. He knew then what it was for, but claims that he was again coerced; that he signed it under duress; but he knew the time for payment was being extended five years by his signing this mortgage, and he says he signed it to keep peace in the family. As to Ralph, his statement was that he signed the mortgage because Mr. Howard advised it.

We think no duress is shown which should avoid these mortgages. It is true that courts of equity grant relief in many cases where there is no legal duress in the strict acceptation of the term, and where the wronged party would perhaps be remediless at the common law; or, as stated in 2 Pom. Eq. Jur. § 951:

"Where there is no coercion amounting to duress, but a transaction is the result of a moral, social, or domestic force exerted upon a party, controlling the free action of his will, and preventing any true consent, equity may relieve against the transaction on the ground of undue influence, even though there may be no invalidity at law."

The rule is stated by Mr. Justice Story in his work on Equity Jurisprudence (section 239), that:

"Where a person does an act or makes a contract when he is under duress, or the influence of extreme terror, or of threats, or of apprehensions short of duress, he may be relieved in equity, for in cases of this sort he has no free will, but stands *in vinculis;* and the constant rule in equity is that where a party is not a free agent, and is not equal to protecting himself, the court will protect him. * * * Circumstances, also, of extreme necessity and distress of the party, although not accompanied by any direct restraint or duress, may, in like manner, so entirely overcome his free agency as to justify the court in setting aside a contract made by him, on account of some oppression or fraudulent advantage or imposition attendant upon it."

There can be no contention as to what the general rule is. The only difficulty is in applying it. It is a question which must be determined by the facts of each case. 6 Am. & Eng. Enc. Law, p. 81, § 16. But this much is settled by all the cases: That the duress or undue influence must be such as would overcome the will of a person of ordinary firmness. *Buchanan* v. *Sahlein*, 9 Mo. App. 552; *Seymour* v. *Prescott*, 69 Me. 376. If the rule of those cases be applied to the present one, it is clear that the defendants have made no such showing as entitles them to be relieved from the operation of these mortgages. Charles executed the second mortgage when nearly 22

years of age.  He had already executed one before that,
after arriving at his majority; and the mere fact that he
executed this second mortgage to keep peace in the
family does not show such duress or undue influence as to
warrant the discharge of such a lien upon his interest in
the premises, when the very fund for which it was given
went into his own property for its betterment.  The case
of Ralph is clearer still.  He did not execute the mort-
gage simply because of the influence which his father had
over him, but upon the advice of his friend and adviser,
and with the understanding that that adviser could have
the mortgage set aside by raising the question of duress
when he was ready to move in the matter.  The court
very properly held that this was no defense to the mort-
gages.

The decree below must be affirmed.

The other Justices concurred.

### ON APPLICATION FOR REHEARING.

LONG, J.  This cause was submitted at the October
term, 1897, and an opinion was filed December 7th fol-
lowing, affirming the decree below.  *Ante*, 160.  Before
the filing of the opinion, the record and briefs were care-
fully examined by the whole court; and, from such exami-
nation, we were all of the opinion that the defense sought
to be made of undue influence by the elder Blodgett upon
his two sons, Charles and Ralph, was not sustained by
the proofs.  As it was there said: "Duress or undue
influence must be such as would overcome the will of a
person of ordinary firmness."  No such influence was
shown to exist, but, on the contrary, it clearly appeared
from the testimony of Charles that he executed the mort-
gage to keep peace in the family, and, from the testimony
of Ralph, that he executed it under the direction and
advice of his attorney.  We can but reiterate that the de-
fendants wholly failed to establish any such claim as set
up.

Counsel for defendants, however, now make a motion for rehearing, not upon the ground upon which the opinion was based, but for the reason that the writer of the opinion omitted to pass upon the question of the right of the appellants to a jury, which was demanded in the court below, and refused. We had supposed that it was generally understood by the bar that this question was finally and conclusively settled in *Brown* v. *Kalamazoo Circuit Judge*, 75 Mich. 274; and the learned counsel for the defendants seem to have regarded the question as decided adversely to their claim here, for in their brief in the original case they say:

"The demand was denied [in the court below], under the decision in the case of *Brown* v. *Kalamazoo Circuit Judge*, 75 Mich. 274. It is respectfully submitted that this decision should be reversed, which will appear from a review of the reasons advanced by Mr. Justice CAMPBELL in support of the decision."

We cannot agree with counsel in that contention. That opinion was filed at the June term, 1889, nearly 10 years ago, and has since been adhered to by this court, and followed in every circuit court in chancery in the State. In it, it was held that Act No. 267, Pub. Acts 1887, is unconstitutional in so far as it assumes to provide a final decision of questions of fact in chancery suits by the verdict of a jury, and the rejection of testimony by the presiding judge as in a suit at law. This opinion was concurred in by the whole bench, and was announced after a very careful review of the Constitution of the United States and of this State, as well as the common law and the English divisions of law and equity; and it was there determined that the cognizance of equitable questions belongs to the judiciary as a part of the judicial power, and, under our Constitution, must remain vested where it always has been vested heretofore. But counsel cite certain provisions of the statutes, of which they now claim Mr. Justice CAMPBELL misconceived the true intent and meaning. Counsel also cite certain cases decided both before and after the case of

*Brown* v. *Kalamazoo Circuit Judge*, claiming they have some bearing on the question, and upon which they ask a reversal of that case. These statutes were referred to by Mr. Justice CAMPBELL as having reference to appeals in chancery cases, and the cases referred to by counsel here hold that appeals in chancery cases are statutory,—a very different question from the one dealt with by Mr. Justice CAMPBELL. The statute of 1887 attempted to deprive the court of equity of the power to determine questions of fact, and to substitute the verdict of a jury in place of it; and, as well reasoned by Justice CAMPBELL, the legislature had no such power. He says:

"The system of chancery jurisprudence has been developed as carefully and as judiciously as any part of the legal system, and the judicial power includes it, and always must include it. Any change which transfers the power that belongs to a judge to a jury, or to any other person or body, is as plain a violation of the Constitution as one which should give the courts executive or legislative power vested elsewhere."

This opinion has been cited with approval in two subsequent cases: *Laprad* v. *Sherwood*, 79 Mich. 523; *Maier* v. *Wayne Circuit Judge*, 112 Mich. 491. The cases cited by counsel which they insist support their contention that they were entitled to a jury are *Demaray* v. *Little*, 17 Mich. 387; *Cady* v. *Manufacturing Co.*, 48 Mich. 137; *People* v. *Hanrahan*, 75 Mich. 611; *Tillotson* v. *City of Saginaw*, 94 Mich. 240; *Lake Superior, etc., Iron Co.* v. *Auditor General*, 79 Mich. 351; *Merriman* v. *Peck*, 96 Mich. 603; *People* v. *Bussey*, 80 Mich. 501; *Schafberg* v. *Schafberg*, 52 Mich. 429; *Maier* v. *Wayne Circuit Judge*, 112 Mich. 491. Most of these cases treat of the question of appeals in chancery, and hold that such appeals are governed and controlled by the statute, and that, in the absence of statute, no such right of appeal exists. Counsel for defendants contend that "therefore the act of 1887 is constitutional, notwithstanding it takes away from the appellate court its former statutory power to disturb the verdict of a jury in the lower court."

The court of chancery has always had the right to pass upon questions of fact without the intervention of a jury. This is so under the English practice, and has ever been the practice in this State. The rules of practice in this State were largely shaped by legislation in accordance with the views of Chancellors Farnsworth and Manning prior to the adoption of the present Constitution. Since the adoption of the present Constitution, no attempt was made by the legislature, until the act of 1887, to deprive the chancery court of its power to determine questions of fact in all cases coming before it. The framers of the Constitution of 1850 did not attempt by that instrument to limit its jurisdiction, or to take from it the powers then possessed. Those powers and jurisdiction, by the Revised Statutes of 1846, were co-extensive with the powers and jurisdiction of the court of chancery of England, with the exceptions, additions, and limitations created and imposed by the Constitution and laws of the State. It is undoubtedly within the power of the legislature to change the formalities of legal procedure; but, as said in *Brown* v. *Kalamazoo Circuit Judge:*

"It is not competent to make such changes as to impair the enforcement of rights. * * * There are various kinds of interests and controversies which cannot be left without equitable disposal without either destroying them or impairing their value. * * * The functions of judges in equity cases in dealing with them is as well-settled a part of the judicial power, and as necessary to its administration, as the functions of juries in common-law cases."

But the right of appeal in chancery cases was recognized in the Revised Statutes of 1846, and has since been recognized as a part of the chancery procedure.

But counsel contend that the cases of *Schafberg* v. *Schafberg* and *Maier* v. *Wayne Circuit Judge, supra,* support their contention. The former case was fully discussed in the latter, in which Mr. Justice HOOKER said:

"It is said that these comments [in the *Schafberg Case*] are *obiter dicta.* The decision is put upon two grounds

one of which is that the proof failed, and so it is possible to say that the decision would have been the same had the question of amendment been omitted; but it may also be said that the decision of the merits was *obiter*, because the bill must have been dismissed upon the other ground so fully discussed. But, whatever may be thought of the consideration given to this statute in the *Schafberg Case*, we may find some light thrown upon it by the case of *Brown* v. *Kalamazoo Circuit Judge*, 75 Mich. 274. This case arose upon a statute (Act No. 267, Pub. Acts 1887) which attempted to ingraft trial by jury upon equity practice; and, in a learned discussion of the subject by Mr. Justice CAMPBELL, this court vindicated the constitutional right of trial by a chancellor in equity cases [75 Mich. 285], closing with the following emphatic utterance: ' Theory amounts to nothing in the history of jurisprudence. The system of chancery jurisprudence has been developed as carefully and as judiciously as any part of the legal system, and the judicial power includes it, and always must include it. Any change which transfers the power that belongs to a judge to a jury, or to any other person or body, is as plain a violation of the Constitution as one which should give the courts executive or legislative power vested elsewhere.' "

This language could not be misunderstood. So that in 1889 the question was settled, so far as the power of the legislature is concerned to ingraft any such rule upon the equity practice; and as late as 1897 the principle is again enunciated, and the above language quoted with approval by this court. We find counsel, however, still persistently urging that a trial by jury in equity cases may be had.

In *Dunn* v. *Dunn*, 11 Mich. 286 ( decided May 20, 1863 ), it was said by Mr. Justice CAMPBELL:

"There is no authority, which I have discovered, which renders it incumbent on any court of chancery, or even proper, to follow a verdict which is not calculated to aid the conscience of the court in solving questions of fact otherwise doubtful. Without going into cases in detail, I refer to *East India Co.* v. *Bazett*, Jac. 91; *O'Connor* v. *Cook*, 8 Ves. 535; *Cleeve* v. *Gascoigne*, 1 Amb. 323; *Lord Faulconberg* v. *Peirce*, Id. 210; *Locke* v. *Colman*, 2 Mylne & C. 42; *Bootle* v. *Blundell*, 19 Ves. 494, 500; *Blackburn* v. *Gregson*, 1 Brown, Ch. 423; *Armstrong* v. *Armstrong*, 3 Mylne & K. 45."

We had thought the distinction between the cases cited by counsel, holding that chancery appeals are statutory, and the present question, so clear, and the point at issue here so well settled by the other cases cited by them, that the contention in their original brief would not be seriously urged. It has never been the practice in this court to discuss every claim made by counsel in briefs, and, indeed, space in the published reports would not admit of that course. But it is intended to discuss every question which may turn the scale one way or the other, or where it may be thought to be of interest to the profession. When, however, a point has been so squarely decided as the present, and that decision often referred to in other opinions, it cannot interest the parties or the profession to again repeat what has been formerly held.

The motion for rehearing must be denied, with costs.

The other Justices concurred.