## GARDNER *v.* WARD.

### Opinion delivered June 26, 1911.

1. COMPROMISE—VALIDITY.—The compromise of a disputed claim furnishes sufficient consideration to uphold the terms thereof, even though the claim be without merit. (Page 593.)

2. CONTRACTS—VALIDITY—DURESS.—To render a contract void because of threats or menaces, it is necessary that the threats and circumstances should be of a character to excite the reasonable apprehensions of a man or person of ordinary courage, and the promise, contract or statement should be made under the influence of such threats or menace. (Page 593.)

Appeal from Garland Chancery Court; *Alphonzo Curl,* Chancellor; affirmed.

Miles B. Gardner died in the early part of the year 1887, owning a quarter section of land about a mile and a half from the city limits of Hot Springs, in Garland County, on which he resided. He left surviving him, his widow, Sophronia Gardner, and Edward M. Gardner, an infant son about one year old. In August, 1887, after his death, another son was born, and he was called Miles B. Gardner, Jr. Miles B. Gardner left a will by the terms of which the lands above referred to were devised to his children. The will was duly probated, and the executors subsequently died. In 1900 H. E. Still was appointed guardian of the estate of said minor children. In 1904 the guardian made application to the probate court for the sale of said land for the support and education of said minors. At that time, Edward M. Gardner was 18 years of age, and was a stout healthy boy, while his brother, Miles B. Gardner, Jr., was an invalid. They lived with their mother. The mother asked for and obtained from the probate court, an allowance of $2,100 for expenses incurred in the support of said minors from the time of the death of their father until the application was made. The probate court made an order directing the sale of said lands for the support and education of said minors. Fred Ward became the purchaser at the sale for the sum of $2,300. The order of confirmation of the sale directed him to pay $2,100 of that sum to the mother of said minors. The guardian executed the deed to Ward for the land, and the same was approved by the court. Ward in turn executed a deed to Mrs. Gardner, the mother of the minors, for one hundred and twenty acres of said land, and retained himself the remaining forty. He paid to the guardian $200 and to Mrs. Gardner $400. This was in addition to the $2,100 claim which had been allowed in her favor. Mrs. Gardner conveyed a two-thirds interest in the said 120 acres to T. McNall for another tract of land situated in the same county. Miles B. Gardner, Jr., died, and Mrs. Gardner and her son Edward moved on the land she had purchased from McNall, and they have since resided there. The 120 acres of land was divided up into a number of smaller tracts from one to

forty acres in area.  These parcels of land were sold to various parties by McNall and Mrs. Gardner, and the purchasers went into possession and have made substantial improvements on them, such as erecting new houses, repairing old ones, building small barns, and setting out small orchards, etc.  The present suit was instituted on the 27th day of August, 1909, by Edward W. Gardner, in the Garland Chancery Court against Fred E. Ward and the other purchasers of said land.  The object of the suit was to set aside the sale of these lands made by the probate court as being void and without jurisdiction.  In 1906 Edward Gardner, while under the impression that he was twenty-one years of age, executed quitclaim deeds to most of the defendants for the lands in controversy.  As a matter of fact, however, Ed. Gardner did not become twenty-one years old until March, 1907.  As soon as the summons in the case was served upon J. A. Kinsey, he went to see Ed. Gardner about compromising the matter.  He was accompanied by Bob Wish, an uncle of Ed. Gardner.  After some negotiation, Kinsey paid Gardner $100 and received a quitclaim deed for that part of the land purchased by him.  Kinsey told Gardner that the other defendants would like to compromise, and suggested that he might get a thousand dollars for the whole compromise.  The suit, as far as Kinsey was concerned, was dismissed, and he is no longer an interested party.  After Kinsey made his compromise, he told others of the defendants about it, and they in turn told still others.  The remainder of the defendants gathered together, and concluded to go to the home of Mrs. Gardner and try to effect a compromise of the suit.  They sent Bob Wish and one Waycaster on ahead of them.  Mrs. Gardner lived about twelve miles from the city of Hot Springs, and her son, Ed. Gardner, lived with her.  Bob Wish, who was her half-brother, came in and asked her where Ed. was.  Mrs. Gardner replied that he had gone on a camp hunt.  Wish insisted that he had not gone on a camp hunt, but had gone to one Hulsey's his father-in-law's.  Mrs. Gardner says that one Martin, who was a friend of their son, had been there earlier in the evening, and had told him that the defendants were threatening him because he had brought suit against them.  Mrs. Gardner got in the buggy with Bob Wish, admitting that her son had gone to his father-in-law's, and went with him out to meet

the people who had come with him. When she met them, there were present the following: Owens, Hicks, Still, Long, and Mrs. Ford. All of them except Long were defendants in the suit. They then determined to go to Hulsey's to try to effect a compromise with her son. She went with them. The distance was twenty-six miles. Hulsey lived on the other side of Hot Springs. When they arrived at the top of the mountain about a mile from Hulsey's, they halted and counseled together. It was finally decided that Wish and Waycaster should go down to the house and bring Ed. Gardner back with them. After daylight Hulsey and Wish came to the top of the mountain, and left Waycaster at Hulsey's house. .The whole party then went down to Hulsey's house, ate breakfast, counseled together, and with Ed. Gardner, until about 10 o'clock when they all repaired to a neighboring justice of the peace, where Ed. Gardner executed · quitclaim deeds to the various defendants for the land they had purchased. As a consideration, he was paid various amounts, which in the aggregate reached about $150.

It is the contention of Ed. Gardner that these deeds were procured by intimidation, and the defendants maintain the contrary. Additional evidence in regard to this matter will be stated in the opinion. The chancellor found all the issues in favor of the defendants, and the plaintiff has appealed.

*J. B. Wood,* for appellant.

1. The sale was void. The land was sold to pay a collusive debt. The evidence shows collusion to gain control of the estate. The sale is not complete until reported and approved by the court. Kirby's Digest, §.3798; 61 Ark. 80; 62 *Id.* 214; 47 *Id.* 419; 54 *Id.* 480; 51 Mo. 406; 21 Cyc. 136.

2. There is no law authorizing the probate court to sell a minor's land to pay a debt. The sale was absolutely *void.* 89 Ark. 284-287; 74 *Id.* 81; 71 *Id.* 220; 47 *Id.* 460; 33 *Id.* 425; 69 Ala. 466; 21 Cyc. 122.

3. The judgment of any court can be attacked by showing a jurisdictional defect apparent upon the face of the record, or that the court acted beyond its jurisdictional limits. 74 Ark. 81; 47 *Id.* .460; 23 Cyc. 1085-1087; 18 Wall. 350-356, 366; 23 Cyc. 1087; 94 Ark. 342.

4.' There is no law authorizing the sale of a minor's land to pay debts. 67 Kan. 468; 20 N. E. 3; 25 Cent. Dig., § 301. Only the income of the estate could have been allowed. Kirby's Dig., § 3792; 83 Ark. 226; 63 *Id.* 450.

5. The land was a homestead. Art. 9, § 6, Const.; 65 Ark. 355; 69 *Id.* 1.

᾿ 6. The proceedings show fraud and collusion. 7 John. Ch. 150; 11 Am. Dec. 386; 16 How. 30; 18 Cyc. 811; 54 Ark. 630; 46 *Id.* 32; 21 Cyc. 107, 108; 2 Am. Rep. 570; Story, Eq., § § 239-246; 9 Cyc. 450; 64 S. W. 329; 9 Cyc. 406; 35 N. E. 958; 28 L. R. A. 478; Kerr on Fraud and Mistake, 399, 400; Bisph. Eq., § 188.

*E. W. Rector,* for appellee.

1. The probate court had jurisdiction to make the order of sale; and if there was no abuse of discretion in the matter, its action will not be disturbed. 65 Ark. 355; 92 Ark. 611; 72 Ark. 101.

2. A purchaser does not have to look further than the order of confirmation. He is not bound to see that the proceeds of the sale are properly applied. 89 Ark. 288; 90 Ark. 170. Hence, if it were true that no allowance for past services for, and past support of, minors could be made, this would not affect the purchaser, as he had only to look to the order of the court.

3. A mother is not burdened with the support and maintenance of her minor children, but she is allowed compensation out of their estate for such support and maintenance. 29 Cyc. 1616; 32 Minn. 385. "Such allowance may be made, not only to provide for the future, ·but also to reimburse her for past expenditures." 29 Cyc. *supra,* and cases cited under note 89; 76 Ala. 534; 16 Ala. 734; 110 Cal. 267.

4. If the allowance of the claim was an irregularity, and the manner of payment an irregularity, such irregularities can not be taken advantage of in a collateral attack.

HART, J., (after stating the facts). It is first contended by the plaintiff that, under the terms of the will, the probate court had no jurisdiction to sell the land in controversy. It is next contended by him that the sale is void, so far as Ward and the other purchasers are concerned, because there was collusion be-

tween Ward and the mother of Edward Gardner in the procurement of the sale in the probate court. In other words, it is claimed by plaintiff that the evidence in the case shows that the whole proceeding under which the land was sold was for the purpose and with the understanding between Mrs. Gardner and Ward that she was, by the proceedings, to gain control of the larger part of the property, and get it out from under the control of the probate court. The views hereinafter expressed render it unnecessary to decide these two propositions of law, for we are of the opinion that the chancellor did not err in holding that the deeds executed on the 3d of September, 1909, by Edward Gardner to the various defendants for the land in controversy were not procured by intimidation. It may be well at the outset to state the law applicable to this phase of the case. It will be noted that Ed. Gardner had brought suit against the defendants a few days before the deeds were executed. He was, on the one hand, asserting title in himself, and the defendants, on their part, were insisting that they owned the land.

In the case of *Satchfield* v. *Laconia Levee District,* 74 Ark. 270, the court, speaking through Chief Justice HILL, said:

"The compromise of a disputed claim furnishes sufficient consideration to uphold the terms of said compromise, even though the asserted claim is without merit or foundation. *Mason* v. *Wilson,* 43 Ark. 172.

"The voluntary adjustment of a matter in dispute or litigation, even when protesting against it, effectually terminates the question or litigation, in the absence of intimidation, fraud or concealment producing such settlement."

In the case of *Bosely* v. *Shanner,* 26 Ark. 280, the court held (quoting from syllabus) :

"To render a contract void because of threats or menaces, it is necessary that the threats and circumstances should be of a character to excite the reasonable apprehensions of a man or person of ordinary courage, and the promise, contract, or statement should be made under the influence of such threats or menace."

Mrs. Gardner testifies that on the evening of the 2d of September, 1909, her son, having received word from his friend Martin that the defendants were threatening him with serious

bodily harm, left for his father-in-law's, which was about twenty-six miles away. She says that when her half-brother, Bob Wish, came there that evening, he told her they were determined to find Ed. Gardner that night, and that she, becoming alarmed lest they should carry out the threats which had been communicated by Martin, first declined to tell where he was, but that when she found out that her half-brother knew where her son was, she thought the best thing to do would be to go along with them. She left the house in the buggy with her half-brother, and when she got to where the defendants were she got out of the buggy and got into Mr. Still's wagon. She says that Still said to her, with an oath: "I am getting tired of this land business." She answered: "Don't come to me like that. Come to me like a man, and put your whisky talk away." She says Still was drinking at the time; that they then started on to Hulsey's. She details the trip across the country to the top of the mountain where they halted. Upon the refusal of her son to come up the mountain, they all went down to Hulsey's after daylight. She says on the way up to the house for breakfast that Still said: "If Ed. don't do something, I will have to." She also says that during the journey Still had his pistol lying on the seat where they were riding; that Ward, one of the defendants, also said to her, "Ed. can go ahead and fight the case, and I will fight the case, too;" and that then Ward said, "If I can not fight it one way, I will take it fist and skull fight." She stated that she could tell that her son was afraid by his ways and looks; that he was pale and looked like a corpse; that her son's actions showed he was afraid of the defendants; that she was with them until about 10 o'clock in the morning, at which time they left to go to the justice of the peace to execute the deed, when she then went home. She said she went there with the crowd because threats had been made that if her son did not do them right they would kill him; that she did not want to see them mob her son because he would not sign such papers as were offered him. Edward Gardner himself testifies that he had been informed that the defendants would mob him if he did not sign the papers they presented to him, and that he signed same because he was afraid that they would mob him. He said that when he settled with Kinsey on the day before that, his uncle, Bob Wish, told him that the defendants were talking

about coming out to horsewhip him, and that he would not be surprised at anything that Still might do; that the next evening Martin came out and told him that there was a mob coming out there to make him sign the deed, and advised him to go somewhere else and stay that night. Hulsey also testified that Ed. Gardner was excited, and was afraid he would be mobbed if he did not sign the deeds. On the other hand, each of the defendants testifies that they had no intention of harming Ed. Gardner, and that they made no threats whatever against him to induce him to sign the deed. They deny in positive and express terms that they ever made any threats of violence against the defendants, and in effect say that they were insistent about the compromise only because they had paid full value for the land once, and that they felt there was no merit in Edward Gardner's claim. They say when they started out that night they thought he was at his mother's home, and that it was understood by him that they were coming out to try to effect a compromise; that when they arrived at his mother's home and found that he had gone over to Hulsey's, they concluded, while they were about the matter, that they had just as well go over there to see him; that they went in the night time because it was cooler and also in order to save time. It is true, as claimed by counsel for plaintiff, that Still does not deny in direct terms that he had a pistol that night, but he does deny that he made any threats in regard to the matter, or that he intended to harm the plaintiff. Long, who was along with the party, was not interested except as attorney for the defendants, and testifies positively that he told Ed. Gardner that the defendants did not intend to harm him, and assured him that if he had thought so he would not have come with them. Long assured Ed. Gardner that the rumors of threats he had heard had been made by the defendants were without foundation, and that, if anything of the kind was attempted, he would abandon the case at once. Long also stated that he heard no threats made. Ed. Gardner admits that Long told him this, but that he did not believe that Long knew just how the matter stood. One of the party, who was a defendant, was a preacher, and another was a woman. On the next day after the deeds were signed Ed. Gardner went to Hot Springs with Hulsey, cashed the checks given him by the defendants, and again talked with some of them.

It will be noted that McNall and Mrs. Gardner divided up said one hundred and twenty acres tract into small parcels of land and sold them to the defendants, who paid value for the land, and who believed that they were getting good titles to same. In good faith they went on the land and began to build themselves little homes and otherwise make substantial improvements on them. During this time Ed. Gardner lived with his mother on the land she had gotten from McNall in exchange for the two-thirds' interest in the one hundred and twenty acres of the land in controversy, and knew that the defendants had purchased from his mother and McNall, paid their value for them, and were occupying and improving them under the belief that they had a good title thereto. Moreover, the testimony shows that his mother had given him forty acres of the land she had acquired from McNall, but had not executed him a deed thereto. They sold this land to the defendant, Ward, received the purchase price therefor, and both Ed. Gardner and his mother joined in the execution of the deed. Other facts and circumstances were adduced in evidence which tended strongly to show that natural justice would prompt Ed. Gardner to have executed these deeds without any consideration. The testimony in this case is very voluminous. The witnesses were examined and cross examined at length. In such case it is very difficult to set out or to comment in detail on the testimony without making the opinion unnecessarily long. We deem it sufficient to say that the testimony is in direct conflict. The testimony on the part of the plaintiff is sufficient to show that he signed the deed on account of threats of great bodily injury to himself. On the other hand, it is equally certain from the testimony of the defendants that they did not attempt or intend to do him any bodily harm. In deciding where the preponderance of the testimony lies, the chancellor had a right to consider all the facts and circumstances adduced in evidence to consider whether the plaintiff, in executing the deed was prompted by a natural sense of justice and a sense of duty to his mother whom he had charged in his complaint with having fraudulently colluded with the defendant, Fred. Ward, to get possession of the lands, and get them from out of the control of the probate court, and as well his moral obligation to the defendants, or whether he was influenced by threats. When we

consider all the relations of the parties toward each other and the details surrounding the whole transaction from start to finish, we can not say that the finding of the chancellor is against the preponderance of the evidence. It is a settled rule of this court that the finding of the chancellor upon issues of fact will not be disturbed on appeal unless it is clearly against the weight of the evidence.

The decree will therefore be affirmed.

WOOD, J., not participating.