ALICE PIRTLE, COMPLAINANT, APPELLEE, *v.* BOB PIRTLE *et al.*, DEFENDANTS, APPELLANTS.

(*Nashville,* December Term, 1932.)

Opinion filed May 20, 1933.

P. F. WILLBANKS, for complainant, appellee.

S. G. BUTLER, for defendants, appellants.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

Complainant is the widow of W. C. Pirtle, who died intestate on August 16, 1931. These parties were married in June, 1922. Each had children by a previous marriage. No children were born as a result of this union. The defendant, Bob Pirtle, is a son of W. C. Pirtle. On July 14, 1923, W. C. Pirtle and complainant executed a note to Bob Pirtle for $2200, and secured same by a mortgage on the 145-acre farm owned by W. C. Pirtle. This sum consisted of a previous indebtedness of $1422.25, a check for $575.75, which was cashed, and the balance was interest at the rate of 8 per cent. Subsequently Bob Pirtle paid the taxes on the farm, and the fire insurance premiums on the dwelling, so that on July 7, 1930, the indebtedness, with interest, amounted to $3554.19, for which W. C. Pirtle and complainant executed a renewal note, payable one year after date. Bob Pirtle also paid all funeral expenses of his father. After the death of W. C. Pirtle the mortgage was foreclosed and the farm was purchased by a brother of Bob Pirtle, who subsequently conveyed it to the latter.

By the bill herein complainant seeks to have homestead and dower decreed to her in said farm, it being alleged that her execution of said mortgage was procured by fraud and duress.

The Chancellor dismissed her bill. The Court of Appeals reversed the Chancellor, and granted complainant the relief sought. The writ of *certiorari* has heretofore been granted and argument heard. Neither court found that complainant had been defrauded, and there is no evidence to support this theory of the bill. Questions are raised as to the regularity of the privy examination of complainant.

In *Shields* v. *Neitherland,* 73 Tenn., 193, 196-197, the court said: "But it has long been settled in this State that a court of chancery has no jurisdiction to enquire into the regularity of a privy examination, or other probate. *Campbell* v. *Taul,* 3 Yer., 548. The authorities in other States are in accord. *Hartley* v. *Frash,* 6 Tex., 208; *Baldwin* v. *Snowden,* 11 Ohio St., 203. The reason is, that the taking of the probate of an instrument under the authority of law is in the nature of a judicial act, an essential part of the conveyance, and cannot be contradicted by parol proof. The policy of the law requires that the official certificate should be conclusive. If it were otherwise, and the certificate only *prima-facie* evidence of the facts intended to be verified, the title to land would lose, in a great measure, that security which the registration laws were designed to ensure. The probate can only be attacked for fraud. *Campbell* v. *Taul,* 3 Yer., 548; *Finnegan* v. *Finnegan,* 3 Tenn. Ch., 510, 514."

Furthermore, section 2, chapter 48, Acts of 1919, provides:

"The acknowledgment of a married woman when re-

quired by law may be taken in the same form as if she were sole and without any examination separate and apart from her husband.''

Section 1 of said act provides that the forms of acknowledgment now in use in this State, or the form prescribed therein, may be used. One of the forms in use, section 3717 of Shannon's Code, is as follows:

''Personally appeared before me (name of clerk or deputy), clerk (or deputy clerk) of the county court of said county (bargainor's name), the within named bargainor, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained. Witness my hand, at office, this —— day of ————, 19—.''

The certificate of the mortgage here involved, exclusive of the privy examination, is as follows:

''Personally appeared before me, S. H. Franks, a notary public in and for said County, the within named bargainors, W. C. Pirtle & Wife, Alice Pirtle, with whom I am personally acquainted, and who acknowledged that they executed the within instrument for the purposes therein contained.''

It will thus be seen that the acknowledgment is in the exact words of the statute.

█ The Court of Appeals found that complainant was procured to execute said mortgage by duress on the part of her husband, who was acting as the agent of the defendant, Bob Pirtle.

Complainant testified as follows:

''Who brought the mortgage to you to sign?

Mr. Spence Franks brought it down there. Mr. Pirtle begged me to sign the mortgage and talked rough to me when I refused.

"What did he say?

"He used lots of bad talk I don't like to use what he said.

"Tell it.

"He said he did not give a God damn how soon I left there, it was his land and he would do as he damn pleased with it. I got to crying so I told him I would not sign it and so Mr. Franks left and went off, this was the first time Mr. Pirtle tried make me sign the mortgage. Mr. Pirtle talked very rough to me, he said Bob was wanting his money and he was going to have it.

"Was you crying when all this took place?

"Yes, of course under such rough treatment he was giving me and seeing my home mortgaged I would cry. Mr. Franks will tell it if he swears the truth. Then Mr. Franks went away without my signature to the mortgage and I said he need not come back with the papers, for I am not going to sign it because you will put me out of a home and Mr. Pirtle said I won't. I said why you will, he said I just owe that much. He said I have everything fixed and Mr. Franks gets up and starts to leave, this was the first time Mr. Franks came for my signature. Mr. Pirtle said, you can sign this or leave and I believed what he said. I said to Mr. Franks bring it back and I will sign it, this was the second time."

Mrs. Lloyd Swindell, a daughter of complainant, gave the following testimony:

"Was you present at any time when any request was given to your mother to sign a mortgage or paper about the land?

"Yes.

"Tell the court about it what was his name?

"Franks the notary public.

"Begin at the first, tell all you know about this transaction. I was there, he came one morning early, papa called mother out and ask her to sign a mortgage and she said she wasn't going to do it. They had a fuss, Franks went away, Mr. Pirtle cursed and told her she just as well sign it for he was going to have a mortgage on it anyway. I wasn't present any more. I don't remember the date it was a few years ago.

"Did you hear of the occasion when she did sign it?

"Well Mr. Franks brought a note there for mother to sign.

"Did you see the note?

"Yes.

"How much was it for do you remember?

"$2200 the first note I don't remember any other note.

"Explain to the court as near as you can your mother's actions and appearance at the time that you was present when she refused to sign it, the mortgage?

"She was crying.

"What was she crying about?

"Because Mr. Pirtle was making her sign her home away.

"Did you hear him say she could sign the mortgage or leave there?

"Yes, he told her that."

Roy Gillet, a son of complainant, testified as follows:

"Do you know anything that would shed any light on this mortgage?

"Yes.

"Tell the court what time a day it was and who brought the mortgage?

"Well early in the morning Mr. Franks brought the mortgage and Mr. Pirtle ask mother to sign it, she re-

fused and would not sign it, they had words over it, mother cried. Mr. Pirtle told her to sign it or leave there. That he was going to have a mortgage on it. Mr. Pirtle was cursing and mother a crying. They had an awful racket. Mr. Franks left without the mortgage being signed. I heard him tell her after Mr. Franks left that she just as well go sign it that he was going to have a mortgage on it anyway.

"Anything else you know about this?

"No I guess not.

"You wasn't there when Mr. Franks came the last time?

"No."

Spence Franks, the notary public who took the acknowledgment to the mortgage, details the transaction as follows:

"You took the mortgage up there for her to sign didn't you?

"Yes, sir, I did. Mr. Winstead carried me up there the first time and they were not at home. Later on I went up there, they were there and Mr. Pirtle said he and wife would be out directly, they came out. I had papers in my hand. Mr. Pirtle said all right, Mrs. Pirtle said she wasn't going to sign it. I said my business is just to get you to sign this willingly and if not, don't you do it, she said she would not. Mr. Pirtle's son asked me to go and look at the hogs out at the barn when we came back and I started to leave she called me back and said she had decided to sign it. She said have you got any money in it? I said yes, I have a check for Mr. Pirtle. She said who is it going to? Give it to me. I said it is made over to Mr. Pirtle.

"Was Mr. Pirtle trying to make her sign it?

"No, he just set there crying with his head down.

"She signed it?

"Yes.

"Did you deliver any papers to them?

"Yes a whole bundle.

"Do you know what it contained?.

Checks and receipts that had been paid off.

"You say she ask you if you had any money for them and who was going to get it?

"Yes.

"Did you deliver to them all papers?

"Yes.

"She called you back to sign it?

"Yes.

"He didn't say anything to her just sat there and cried?

"Yes."

On cross-examination witness testified as follows:

"Now when the thing got a little too hot for you, you went to the barn?

"Did not get too hot·for me, I went to see some hogs they ask me to.

"Yes. How far were they from the house?

"About 100 yards.

"Do you know what took place in the house while you were gone?

"No.

"You know she was crying when you left?

"No."·

"On redirect examination witness testified:

"When complainant came into the house, she said you have come to get me to sign my home away to Bob Pirtle. I said only to secure what Mr. Pirtle owes him,

she commenced and called Mr. Pirtle everything she could lay her tongue to and called him all kinds of names. I have never permitted anyone to sign a paper unwillingly."

Whether the conduct of W. C. Pirtle, as testified to by complainant, constitutes duress, we find it unnecessary to decide. The authorities are somewhat in conflict as to this. See 41 C. J., 436-437; 9 R. C. L., 716; *Gabbey* v. *Forgeus,* 38 Kan., 62; *Detroit National Bank* v. *Blodgett,* 115 Mich., 160; *Edwards* v. *Bowden,* 107 N. C., 58.

We are of the opinion that in the circumstances of this case the evidence is insufficient to justify the court in setting aside so solemn an instrument as a mortgage. It will be recalled that neither of the children of complainant was present when the mortgage was executed, but their testimony relates to a previous occasion. W. C. Pirtle being dead, the only living persons who were present when the acknowledgment was had are complainant and Mr. Franks, the notary public. Complainant is vitally interested. Mr. Franks has no interest in the result of the suit. It may be doubted whether the combined testimony of complainant and her two children, even if they had been present when the mortgage was executed, would be sufficient to overcome the positive testimony of Mr. Franks, particularly in view of the long delay and the conduct of complainant in permitting the defendant to make additional advances, for which she and her husband executed renewal notes embracing these additional expenditures. Neither does it appear that complainant, prior to the death of her husband, acquainted the defendant with the fact that she was coerced into executing said mortgage. The authorities are harmonious in holding that such an instrument will not be in-

validated upon the uncorroborated testimony of the husband and wife. *Hardison* v. *Billington,* 82 Tenn., 350; *Gates* v. *Card,* 93 Tenn., 334; *Crane & Co.* v. *Hall,* 141 Tenn., 563.

For another reason the complainant is not entitled to the relief sought, and that is the record fails to disclose any knowledge on the part of the mortgagee that W. C. Pirtle coerced his wife into executing this mortgage. The defendant was not present when the mortgage was executed and the acknowledgment taken. There is no evidence that he in any manner procured or induced complainant to execute the instrument, or that he requested his father to coerce complainant into executing the mortgage, or had any knowledge that he did so. Numerous witnesses testified that complainant stated in their presence that the farm belonged to the defendant.

The authorities, without exception, hold that where the mortgagee is without knowledge of the fact that the husband compelled the wife to execute the mortgage by duress, he is a purchaser for value. 41 C. J., 436; *Smith* v. *Commercial Bank* (Fla.), 4 A. L. R., 862; *Hale* v. *Hale* (Ky.), 53 S. W. (2d) 555.

In the facts of this case the husband cannot be treated as the agent of the mortgagee. It will be recalled that the mortgage was given to secure a past indebtedness of $1422, as well as a present loan of $575.

In *Grotenkemper* v. *Carver,* 77 Tenn., 286, the court, in considering the question of the agency of the husband for the mortgagee, said: "It is also clear, as held by the chancellor, that the husband cannot be considered as the agent of the mortgagees in procuring his wife's concurrence in the deed. Much the largest part of the consideration secured by the mortgage was new, and passed

at the time and on the faith of the security. The rule in such case is that the payment of a substantial consideration at the time will make the mortgagee a purchaser for value: *Gordon* v. *English,* 3 Lea, 634.''

When this mortgage was executed the farm was worth $7500. Defendant could have reduced his debt to judgment and collected same by levy on the land, after having had homestead assigned. Quite likely, under present conditions, if homestead and dower were set apart to complainant, the remainder would be insufficient to take care of defendant's debt. This illustrates the necessity of acting promptly in setting aside an instrument procured by fraud or duress, and is a circumstance to be considered in a case of this character.

For the reasons stated, we feel constrained to reverse the decree of the Court of Appeals and affirm that of the Chancellor.