

*Harry Neelly* and *Buzbee, Harrison, Buzbee & Wright,* for appellant.

*Roth & Taylor* and *Yingling & Yingling,* for appellee.

McHaney, J. On September 26, 1937, appellee was in the temporary employment of appellant as a casual laborer. The appellant operates a pipe-line for the transportation of natural gas through the State of Arkansas and through White county, with a pumping plant at West Point in said county. It became necessary to do some extra work around its pumping plant at West Point and appellant hired for temporary employment appellee and a number of others living in that vicinity.

Some of these employees had made an excavation around a pressure or header tank which is about 16 inches in diameter and 14 feet long. The ends of this tank were welded in, and on the west thereof a pipe was welded to the end and this pipe connected with another pipe by means of bolts passing through flanges with a gasket between the flanges. A leak of gas was discovered

at this joint where the gasket was, and the employees were ordered out of the pit until the gas pressure was shut off. This was on Friday afternoon and they were ordered to report back on Sunday morning at 6:30, which they did. Appellee and three others went to work about this tank, not knowing that the pressure had not been shut off, and a short time later, the west end of the tank blew out, causing some injuries to appellee and the others. Appellee got some dirt or sand in his eyes and some skin abrasions on his arm and leg. He and two others were taken to the hospital of Dr. Porter Rogers of Searcy. He did not want to stay in the hospital because he didn't think he was sufficiently injured, but did stay one night and until noon the following day when he was discharged by Dr. Rogers, who told him he thought he was all right, and thought he could go back to work in a day or two. He said he didn't want to spend the night in the hospital and told them he was not hurt. He went back to work for appellant after being off three or four days and worked for it as long as the job lasted without making any complaint as to his condition.

On October 8, 1937, he made a settlement with appellant through its superintendent, acting for the insurance carrier, for a payment to him of $16, covering four days' loss of time, and signed a written release, in which he acknowledged receipt of said sum of money, and that he released and forever discharged appellant, its agents, servants and all other persons "from any and all actions, claims and demands whatsoever which claimant now has or may hereafter have on account of or arising out of the accident, casualty or event which happened on or about the 26th day of September, 1937, including those consequences thereof which may hereafter develop as well as those which have already developed or are now apparent." It was further provided therein that he (claimant) "warrants that no promise or agreement not herein expressed has been made to claimant; that in executing this release claimant is not relying upon any statement or representation made by the party or parties hereby released or said party's or party's agents, servants or physicians concerning the nature, ex-

tent or duration of the injuries and/or damages . . ., but is relying solely upon his own judgment; . . . and that before signing and sealing this release claimant has fully informed himself of its contents and meaning and executed it with full knowledge thereof."

On June 27, 1938, appellee filed this action against appellants to recover damages for injuries to his eyes and for injuries to his nervous system which is termed traumatic neurosis. The negligence charged was in failing to exercise ordinary care to furnish him a reasonably safe place in which to work. Appellants defended on a number of grounds, including the release above set out. Trial resulted in a verdict and judgment against appellants in the sum of $5,000, and this appeal followed.

In view of the fact that we have reached the conclusion that the court erred in refusing to direct a verdict for appellants on their request so to do, because of said release, it becomes unnecessary to discuss other assignments which may be equally meritorious.

Appellee is 25 years of age and appears to be a young man of average intelligence. He testified very frankly about the execution of the release and that he understood its provisions. He knew he was releasing and acquitting appellants for all injuries presently suffered and all that might subsequently develop. He testified that he went in to see Mr. Baum in his office in West Point who told him he had the release and wanted him to sign it; that Mr. Baum told him to read it over, which he did, and he didn't want to sign it right then, but Baum told him it had to be signed that afternoon. Appellee said: "I told him I would go and talk to my dad and come back in the morning and let him know; that I didn't want to jump up and do it without studying it over, and he said it had to be signed that day and I said I wanted to work and he said it had to be signed if I worked." He further testified that at the time he signed the release he had not had advice from any physician other than Dr. Rogers, who told him he ought to be able to go to work and be all right in a short time. He said that he told Mr. Baum that fellows that were in the army

that got shell shocked might be affected years afterwards. As far as he knew then, he had no permanent injury. He says that for some months or more after the accident the explosion did not seem to bother him, but later it did affect him, causing him to have bad dreams about working at this place, had loss of appetite and sleep. Finally he went to see a doctor about a month later. He is now afflicted with nervousness, but is and has been most of the time employed and making more money than he was at the time of the injury.

He made no complaint to Dr. Rogers of any nervous injury and in fact had no such injury at the time Dr. Rogers examined him or admitted him to or discharged him from the hospital, and did not have for at least a month or more afterwards. Dr. Rogers did not tell him that he would have no after effects from the explosion, such as a shell shocked veteran might have, and that matter was never discussed between them. The suggestion that he might have nervous trouble of this kind later was made by himself to Mr. Baum at the time they were discussing the matter of his signing the release. This shows that he did not rely and could not have relied on any statement or assurance of Dr. Rogers, a question the court erroneously submitted to the jury in instructions 5, 6 and 8 for appellee. Moreover the written release specifically says that he is ''not relying upon any statement or representation made by the . . . physicians concerning the nature, extent or duration of the injuries . . . but is relying solely upon his own judgment.'' He testified very frankly that he read this release before signing it and understood it. On cross-examination he was asked and answered as follows: Q. You did sign a release? A. Yes, sir. Q. You knew what you were signing? A. Yes, sir. Q. I believe you said a while ago that you told Mr. Baum that you didn't want to sign the release without talking to your father? A. Yes, sir. Q. You told him about the shell shocked soldier and you didn't know when it would affect you? A. No, sir. Q. What did you say about that? A. I told him I felt all right at that time and that these fellows that were shell shocked felt all right then, but years to come

it would affect them. Q. You knew that at the time you signed the release? A. What is that? Q. You knew you might have a shock like that at the time you signed the release? A. I didn't know it, I said it might affect me. Q. You took the money? A. Yes, sir. Q. You cashed the check? A. Yes, sir. Q. You went back to work? A. Yes, sir. Q. You worked there as long as they had anything for you to do? A. Yes, sir.

This and other testimony of appellee shows conclusively that he was not relying upon any representation made by Dr. Rogers as to what his future condition would be, just as he stated in the release itself, but was relying on his own judgment. While it is true that this court has often held that a release executed by an injured person in reliance on a mistaken or fraudulent statement of the physician of the defendant that such injuries were slight and temporary and were not permanent is not binding on the releasor, we do not have such a case here. Appellee went to see Dr. Rogers who washed out his eyes, told him to go to the hospital and get cleaned up, which he did. He told the doctor and the nurses he was not injured, did not want to spend the night in the hospital, and did in fact go home the next day. He went back to work for appellants a short time later and worked as long as it had work for him to do.

In *Crockett* v. *Mo. Pac. Rd. Co.*, 179 Ark. 527, 16 S. W. 2d 989, this court said: "The undisputed testimony shows that appellant's intestate, the person injured in the collision or accident, executed a full release to the railroad company for all damages or injuries, including both known and unknown injuries and future developments thereof growing out of or in any way resulting from the accident or collision, describing it, for the consideration paid; and, there being no fraud alleged or proved in the procurement of the injured person's acceptance of its terms, no mental incapacity alleged or shown, and no claim of the injured person having executed the release in reliance upon the statement of a physician as to the extent of the injury suffered, both parties were necessarily bound by it, and

the court did not err in directing the verdict. *Kansas City S. Ry. Co.* v. *Armstrong*, 115 Ark. 123, 171 S. W. 123; *Francis* v. *St. Louis, I. M. & S. Ry. Co.*, 102 Ark. 616, 145 S. W. 534; *St. Louis, I. M. & S. Ry. Co.* v. *Campbell*, 85 Ark. 592, 109 S. W. 539; *Mo. Pac. Rd. Co.* v. *Elvins*, 176 Ark. 737, 4 S. W. 2d 528.''

While there is a claim here that the release was executed in reliance upon the statement of a physician as to the extent of the injuries, such claim is not well founded, so the release is binding on both parties.

Appellee cites and relies on the case of *Perkins Oil Co. of Del.* v. *Fitzgerald*, 194 Ark. 14, 121 S. W. 2d 877, as supporting the claim or contention that appellee was coerced into signing the release. We think there is no evidence to support duress, coercion, or undue influence. Appellee testified that Mr. Baum told him he would have to sign the release that afternoon, that ''It has got to be in the mail this afternoon and if you don't sign it you sure as hell won't work.'' It must be remembered that appellee was only a casual employee and worked only a short time afterwards, but as long as there was extra work to be done. In the Perkins Oil Co. case, Fitzgerald was totally disabled from future employment, and the coercion there used was not directed against him, but against his stepfather's further employment, which would have adversely affected his mother, himself and other members of his family. Moreover, the court submitted no such question to the jury.

Appellee also contends that the consideration is grossly inadequate. He understood fully that it represented four days' loss of time and nothing more, and if he accepted, acting on his own judgment as to his injuries, and the extent and duration thereof, as we have already determined, it is as valid and binding as if it had been very much more. It cannot be said to be unsubstantial or inconsequential.

The judgment is, therefore, reversed and the cause dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.

MEHAFFY, J. (dissenting). The majority in this case decided but one question, and that is the effect of the release. It is stated in the majority opinion:

"In view of the fact that we have reached the conclusion that the court erred in refusing to direct a verdict for appellants on their request so to do, because of said release, it becomes unnecessary to discuss other assignments which may be equally meritorious."

The appellee recovered judgment for $5,000 for personal injuries. Dr. Murphy testified in substance that he came to the conclusion in examining appellee that he was dealing with a case of traumatic neurosis; he thought that was what was the matter with appellee because of the positive symptoms, and in a majority of cases, this condition is permanent. He found nothing to indicate that appellee was feigning. Persons in his condition get afraid they are going to become insane or get paralysis or are going to become invalids, and they gradually get worse. In his opinion the appellee's trouble may be permanent. Any work that exposes him to sudden and loud noises and sounds of machinery, witness does not think he will be able to do. Thinks the neurosis in this case is as real as a "shell-shocked veteran."

If the jury believed Dr. Murphy's testimony, as it had a right to do, the verdict was very moderate. The amount paid him for the release was $16, which appears to be wholly inadequate.

Appellee testified that he did not want to sign the release and asked permission to see his father before he did; this they would not permit him to do. He then said he wanted to work, and he was told by the company's representative that unless he signed that release at that time he could not work any more. Telling a laborer, who must perform labor for his living, that if he does not sign the release he will lose his job, is about as effective a way to coerce him as could be found.

When the facts and circumstances are considered; that he was a laborer, and this court has repeatedly held

that the first duty of a servant is to obey his master; the fact that the company's doctor told him he would be well in a very few days, although the doctor probably believed this to be true; that he was not permitted to see his father before signing the release; that his injury is permanent, and that he was paid a wholly inadequate sum, I think the circumstances justify a cancellation of the release. At any rate, these facts were sufficient to make this a jury question.

"A nominal or grossly inadequate consideration for a release will be given serious consideration as affecting the question of fraud in its procurement. When due weight is given to other surrounding conditions, and there is evidence that the consideration is inadequate, it is a circumstance which, in connection with other circumstances, may be submitted to the jury, and, if grossly inadequate, it alone is sufficient to carry the question of fraud or undue influence to the jury, and where there is inadequacy of consideration, but it is not gross, it may be considered in connection with other evidence on the issue of fraud, but will not, standing alone, justify setting aside a contract or other paper writing on the ground of fraud. And therefore, on the question of fraud *vel non* in inducing an employee to accept benefits from a relief department in release of the master's liability for negligent injuries, his situation, conduct, and surroundings at the time, as well as the amount received, may be considered." 23 R. C. L. 395.

"There cannot be a release of a cause of action for personal injuries without unequivocal acts showing expressly or by necessary implication an intention to release. Generally the construction of the release as to the actual intent of the parties presents a question of fact to be determined from the surrounding conditions and circumstances, construed with reference to the amount of consideration paid and the language of the release itself. The amount of consideration paid should have considerable force in determining whether the releasee was simply paying the releasor for loss of time or some other specific element of damage, or whether

it indicated payment of a substantial sum in consideration of which the releasee secured himself against all further developments and the releasor assumed the risk thereof." 23 R. C. L. 397; *Chi. R. I. & P. Ry. Co. v. Matthews*, 185 Ark. 724, 49 S. W. 2d 392.

The record plainly shows that the $16 paid appellee was for his loss of time and nothing more. I am unable to understand how anyone can read the printed record and imagine that he knows more about the credibility of the witnesses and the weight to be given their testimony, than the trial judge and jury.

I respectfully dissent from the majority opinion and I am authorized to say that Mr. Justice Humphreys agrees with me in this dissent.

Opinion delivered April 29, 1940.