Wanda Jo SIMS *v.* FIRST NATIONAL BANK,
Harrison

79-244                                    590 S.W. 2d 270

Opinion delivered December 3, 1979
(In Banc)

[Rehearing denied January 7, 1980.]

*Thomas A. Martin, Jr.,* for appellant.

*Terry M. Poynter,* of *Poynter, Huckaba & Gearhart,* for appellee.

JOHN A. FOGLEMAN, Justice. The cause of action involved on this appeal was commenced on December 16, 1977, when appellee First National Bank of Harrison filed a third party complaint against appellant Wanda Jo Walls Sims and her husband C. J. Sims for foreclosure of two mortgages in an action which had been instituted by a materialman to establish and foreclose a lien for materials and supplies. One mortgage was on a house in Robinwood II, a subdivision of Harrison, on property owned by C. J. Sims. The other mortgage was a second mortgage on a tract of land owned by appellant in Bergman, Arkansas. Appellant filed a counterclaim and cross-complaint in which she alleged that the

mortgage on her property was obtained by duress and undue influence exercised by her husband, C. J. Sims, that the mortgage was obtained by appellee's fraudulent representative that $15,000 in "new money" would be loaned by appellee if her property was mortgaged as additional security to the bank and that she was entitled to rescind the contract on the ground that no Truth in Lending disclosures regarding the transaction were provided to her.

After a trial on the issues, appellant's contentions were rejected by the chancery court and a decree of foreclosure entered. On this appeal, appellant asserts the following points for reversal:

I

THE COURT ERRED IN FINDING THE APPELLANT'S EXECUTION OF THE MORTGAGE WAS NOT OBTAINED BY DURESS AND UNDUE INFLUENCE AND THAT THE APPELLEE WAS NOT THE PROXIMATE CAUSE OF SAME.

II

THE COURT ERRED IN FINDING THAT THE MORTGAGE SHOULD NOT BE CANCELLED BECAUSE OF FRAUD ON THE PART OF THE APPELLEE BANK.

III

THE COURT ERRED IN FINDING THAT THE TRANSACTION IN REGARDS THE APPELLANT WAS EXEMPT FROM FEDERAL TRUTH IN LENDING LAWS.

We shall treat the points for reversal in the order presented.

Appellant alleged in a cross-complaint against First National Bank that the mortgage on the tract of land owned by her should be set aside and removed as a cloud on her title because her signatures on the note secured by the mortgage and on the mortgage itself were obtained by duress and

threats that her husband would be subject to criminal prosecution if those instruments were not executed. She also alleged that the note and mortgage were obtained by duress and fraud on the part of her husband, C. J. Sims, and that this duress and fraud were the direct results of threats by the bank that her husband would be subject to criminal prosecution. The final decree contained a recital that the court could not find any substantial evidence of duress on the part of plaintiff against appellant, although she may have been upset by the financial circumstances in which her husband, C. J. Sims, found himself and may have feared his being financially ruined. There was evidence that may well have been taken to establish probable cause for a criminal prosecution against C. J. Sims, and threats to prosecute would themselves have been a basis for cancellation on account of duress only if the charge was simulated. See *Union Life Ins. Co.* v. *Johnson,* 199 Ark. 241, 133 S.W. 2d 841; *Shattuck* v. *Watson,* 53 Ark. 147, 13 S.W. 516; *Marvin* v. *Marvin,* 52 Ark. 425, 12 S.W. 875.

C. J. Sims had been a customer of the First National Bank for many years. Numerous loans had been made to him and the relationship had been satisfactory. In March, 1976, the bank made a loan for $37,000 for construction money for a house to be built by Sims in Robinwood II for resale. The Square Deal Construction Company, in which Sims was a partner and Ronnie Paul, the managing partner, was to construct the house. After some $32,000 had been advanced on the construction money loan, Ron Shaver, the bank's loan officer who had handled the loan, found, upon inspection in August or September, 1976, that the house was only one-third complete. It appeared that the bank had little or no security for its loan.

The same construction company was, during the period advances were being made to Sims, doing extensive remodeling on the house located on the tract which was the separate property of appellant. This work was started in February, 1976, for a contract price of $17,000. Appellant had purchased this tract, known as the Bergman property, from C. J. Sims and his former wife, Patricia, in 1975, for $28,000, but the title was not transferred until March 17, 1976, after C.

J. Sims had been divorced from Patricia. Appellant paid $1,000 in cash and assumed a mortgage of $23,000 in favor of a savings and loan association. She made three monthly payments on this mortgage debt. It is not shown how she paid the rest of the purchase price, if she did. Appellant and C. J. Sims were married June 20, 1976, two months after she had been divorced from her former husband, Thomas Walls, to whom she was married when she started negotiations with Sims, a real estate agent, for the purchase of the property. After appellant married Mr. Sims, the monthly mortgage payments were made from their joint bank account. Appellant had been employed by Airport Realty Company, a partnership in which both C. J. Sims and Ronnie Paul were partners. It seems that she was not employed after the marriage.

Sims testified that he withdrew from Square Deal Construction Company in June, 1976, after a total of $32,000 had been advanced by the bank on the construction loan. Mr. Sims testified that this money went to Square Deal Construction Company, except for $7,000 paid for the lot on which the house was to be built. Appellant testified that Sims' withdrawal from this partnership took place four days prior to her marriage to him. She stated that Mr. Sims agreed, at that time, to assume the $17,000 remodeling cost. C. J. Sims testified that when he withdrew from the partnership, it was agreed that Square Deal Construction Company would complete both the house in Robinwood II and the remodeling job. When confronted, Sims told Shaver that not all the money advanced by the bank had gone into the house in Robinwood II, but assured Shaver that he could get the house finished in six months.

Appellant is in no position to assert that the mortgage was obtained by duress because of fear of prosecution of her husband because there is no evidence that anyone connected with the bank made any threat to her to prosecute him or that a representative of the bank induced her to execute the mortgage by any threat of such prosecution. *Goodrum* v. *Merchants' & Planters' Bank,* 102 Ark. 326, 144 S.W. 198, Ann. Cas. 1914A 511. Appellant did not testify that such a threat was communicated to her by the bank or by her

husband. C. J. Sims testified in a deposition introduced into evidence that he did not believe that he ever revealed the threat of prosecution to her. There is simply no evidence that any such threat was ever communicated to her by anyone. It was not contended at the trial, or here, that the agreement under which appellant signed the mortgage constituted the compounding of a felony. An obligation given in settlement of a civil liability arising from a wrong which is both public and private is not invalid because the offender is also subject to criminal prosecution. *Goodrum* v. *Merchants' & Planters' Bank,* supra.

The question here then is whether appellant is entitled to a cancellation of the mortgage on her separate property because of duress by her husband. To some extent, this question is dependent upon whether Mrs. Sims executed the mortgage out of a sense of duty to her husband or by reason of his threats. In order to disturb the chancellor's findings, we must be able to say that, when all the relations of the parties toward each other and the details surrounding the entire transaction are considered, they were clearly against the preponderance of the evidence. *Gardner* v. *Ward,* 99 Ark. 588, 138 S.W. 981. This we cannot do. Neither can we say that appellant met her burden of proof that she was compelled, not merely persuaded, to do what she did. *Oberstein* v. *Oberstein,* 217 Ark. 80, 228 S.W. 2d 615. We could not say that she did meet her burden unless we accept her testimony as credible and disregard evidence tending to lead to a contrary conclusion, and we are unable to do this. In considering this question, it is significant that Mrs. Sims made no claim that the contract was entered into under duress until this foreclosure suit was filed. Silence or acquiescence in the contract for any considerable length of time amounts to ratification. See *Oberstein* v. *Oberstein,* supra. See also, *Pirtle* v. *Pirtle,* 166 Tenn. 180, 60 S.W. 2d 172 (1933).

The mortgage foreclosure was filed on December 16, 1977. On January 3, 1978, appellant filed an answer that was simply a general denial. Her cross-complaint in which she first raised the issue of duress was filed on February 16, 1978. The mortgage had been executed on June 17, 1977, so

for eight months, the duress under which appellant claims to have acted was a well kept secret. It is significant that she did not mention or in anywise indicate to the bank's officers and employees or the notary public who took her acknowledgment that she was not acting freely and voluntarily. See *Rowley* v. *Rowley,* 144 Okla. 157, 290 P. 181 (1930); *Wallach* v. *Hoexter,* 17 Abb. N.C. (N.Y.) 267 (1886); *Marston* v. *Brittenham,* 76 Ill. 611 (1875). The bank's loan officer testified that she came into the bank two hours before the arrival of her husband on the date the mortgage was executed at the bank. He testified that, at the time of closing, the atmosphere was calm and casual like a regular, normal closing. Mrs. Sims testified that she inquired why the mortgage debt matured in only six months, but she does not say that she made any other inquiry or protest. Appellant and her husband were actually separated for more than a week in August, 1977. Her failure to complain as soon as the coercion was eliminated is inconsistent with her complaint in the foreclosure action. *Marston* v. *Brittenham,* supra. See also, *Pirtle* v. *Pirtle,* supra.

In attempting to meet her burden of demonstrating error in the holding of the chancery court and of showing that she had met her burden of proof on this issue, appellant relies upon her own testimony and that of her husband. He testified that, commencing two weeks before he obtained her signature, he regularly discussed the matter of her signing the mortgage and threatened to leave her. She testified that her husband, for more than a week, began talking to her about the mortgage at breakfast, and again whenever he came back home, reminded her of the duties she owed him, accused her of gross disloyalty and threatened to leave her; that she had wanted to talk to her lawyer but was unable to reach him; that she had been married and divorced twice, and feared that her third marriage was beginning to fall apart; and that she had a sick child and an acute need for security. She further relied upon the fact that she gained no financial advantage by executing the mortgage and evidence tending to show that the bank found itself in the position of having a loan of $40,000 outstanding for which it had no collateral, and the fact that Shaver, an officer of the bank, knowing that Mr. Sims was not applying the loan proceeds to the construc-

tion of the house for which the loan was made, made final disbursements totaling $5,000.

Duress by her husband may well be sufficient to invalidate a mortgage executed by a wife to a third party. Duress consisting of threats exciting a fear of such a grievous wrong as death, great bodily injury or unlawful imprisonment, would probably justify a cancellation of a contract if the party, acting under such threats, moved to cancel it promptly. *Burr* v. *Burton,* 18 Ark. 214; *Duncan* v. *Hensley,* 248 Ark. 1083, 455 S.W. 2d 113. See also, *Rowley* v. *Rowley,* supra. The defense of duress was somewhat enlarged in *Perkins Oil Co.* v. *Fitzgerald,* 197 Ark. 14, 121 S.W. 2d 877, where it was asserted against the person making the threats; the person alleging that he acted under duress was totally disabled from future employment, and the coercion which caused him to sign a release of liability for his disabling injury was directed against his step-father's future employment, the loss of which would have seriously affected his mother, himself and the other members of his family. See *Mississippi River Fuel Corp.* v. *Hamilton,* 200 Ark. 475, 139 S.W. 2d 404.

Even under the *Fitzgerald* view, it must be shown that there was a threat of some grievous wrong to establish duress. The threat of a husband to abandon his wife if she does not execute a mortgage on her separate real estate is not sufficient basis for cancellation of the mortgage unless it is made with the knowledge and consent of the mortgagee or the mortgagee knew at the time of the execution of the mortgage that it was executed by reason of such a threat by the husband. *Line* v. *Blizzard,* 70 Ind. 23 (1880); *Luna* v. *Miller,* 171 Okla. 260, 42 P. 2d 809 (1935); *State* v. *Scoggins,* 107 N.C. 959, 12 S.E. 59 (1890); *Marston* v. *Brittenham,* supra; *Wallach* v. *Hoexter,* supra. See also, *Pirtle* v. *Pirtle,* 166 Tenn. 180, 60 S.W. 2d 1972 (1933); *Donahue* v. *Mills,* 41 Ark. 421; *Meyer* v. *Gossett,* 38 Ark. 377. This is but a facet of the general rule that a mortgage executed by a wife cannot be avoided because it was procured by duress practiced by the husband, in the absence of a showing that the mortgagee participated in or had knowledge of it. *Harper* v. *McGoogan,* 107 Ark. 10, 154 S.W. 187. See also, *Hale* v. *Hale,* 245

Ky. 358, 53 S.W. 2d 554 (1932); *Pirtle* v. *Pirtle,* supra; Annot., 4 ALR 864, 868.

The only argument that appellant advances as a basis for knowledge of, or notice to, appellee of duress by C. J. Sims is that the bank was on notice of the relationship between Sims and his wife, and, because of the fact that there was no financial reason for her to enter the transaction, and she had nothing to gain and everything to lose by it, the bank was under the duty to inquire as to the voluntariness of the transaction. This argument by appellant is unconvincing and no authority for it is cited, so we will not consider it extensively. *Dixon* v. *State,* 260 Ark. 857, 545 S.W. 2d 606. We should mention, however, that there is no evidence that the bank knew of any marital problems of the parties, at least part of which arose from the arrest of Mr. Sims' son for some crime, for which he is serving a life sentence; that Sims testified that he assured his wife everything could be worked out in a few months; that Sims probably had more money invested in the property than appellant, who could not account for more than $3,000 of her own money in its acquisition; that appellant testified that if it were to be assumed that his investment in the property was from $17,000 to $22,000, in contrast to her $3,000, it was not unbelievable that he would ask her to put it up as collateral; and that she wanted him to have a chance to clear himself with the bank.

Appellant had the burden of proving duress by clear, cogent and convincing testimony. *Duncan* v. *Hensley,* 248 Ark. 1083, 455 S.W. 2d 133; *Davidson* v. *Bell,* 247 Ark. 705, 447 S.W. 2d 338. This she failed to do.

Because of the relationship of husband and wife, appellant's burden of proof may not have been as great on the question of undue influence, but she was not relieved of the burden of showing the bank's knowledge or participation. We cannot say that she was entitled to cancellation of the mortgage on the ground of undue influence, because there is no evidence that the bank knew of, or participated in, the influence practice upon her. *Harper* v. *McGoogan,* supra. See also, *Marston* v. *Brittenham,* supra.

Appellant contends, however, that she was induced to sign the mortgage by the fraudulent representation of the bank's officer that the bank would loan her husband $15,000 in addition to the existing debt. She admits that the evidence is conflicting on this point. The testimony shows that C. J. Sims' outstanding debt to the bank at the time the mortgage was signed consisted of $37,000 secured by the mortgage on the house under construction and $15,000 represented by unsecured notes. Ron Shaver testified that he did not promise to lend, and that Sims did not request, any additional money. Mrs. Sims testified that she had told Shaver her understanding was that $15,000 additional money would be advanced to finish the house in Robinwood II and that Shaver had said that with six months and $15,000, C. J. Sims could finish the house. She admitted, however, that she had previously testified in a deposition that the $15,000 was to be used for an investment by her husband in an industrial park.

C. J. Sims testified that he understood that the $52,000 note secured by the mortgage included an additional $15,000, and that this was mentioned at the time the mortgage was signed, but that he had told Shaver that he did not need it for a week or two and that he did not want to pay interest on it in the meanwhile. Mr. Sims said that he first learned, through a subsequent conversation with Shaver, that the additional $15,000 would not be advanced two weeks later. Yet, on cross-examination, Mr. Sims testified that he had examined all the notes and mortgages introduced and that there was no question that he owed the money.

Deborah Keef, a loan secretary employed by the bank, testified that C. J. Sims did ask Shaver about additional money, separate from the transaction involving the mortgage which had just been closed. She said Shaver said that he could not disburse any more funds until he saw how this particular transaction worked out. She recalled that Shaver had used the words "wait and see." Shaver said that there had been no discussion of an additional $15,000 up until the closing and that he did not recall the request for additional funds about which his secretary had testified.

The chancellor found that the signing of the instruments

on which the suit was brought was for the purpose of extending the existing loan for six months to give Mr. Sims an opportunity to finish the house and sell it for a sum that would at least reduce the indebtedness.

A mortgage by a married woman to secure her husband's debts, whether they be existing debts or debts to accrue, is valid and enforceable. *Goodrum* v. *Merchants' & Planters' Bank,* 102 Ark. 326, 144 S.W. 198, Ann. Cas. 1914A 511; *Collins* v. *Wassell,* 34 Ark. 17; *Scott* v. *Ward,* 35 Ark. 480. See also, *Ocklawaha River Farms Co.* v. *Young,* 73 Fla. 159, 74 So. 644 (1917). Consideration for the mortgage need not pass to the wife as consideration to the husband is sufficient. *Scott* v. *Ward,* supra. See also, *Gillespie* v. *Simpson,* _____ Ark. _____, 18 S.W. 1050. An extension of time for the payment of the husband's debt is sufficient consideration. *Scott* v. *Ward,* supra; See also, *United States Banking Co.* v. *Veale,* 84 Kan. 385, 114 P. 229 (1911); *Hunt* v. *Central Savings Bank & Trust Co.,* 76 Colo. 480, 231 P. 60 (1925); *Gibson* v. *Sheen,* 128 Neb. 728, 260 N.W. 186 (1935). The question of fraudulent representations resolves itself into one of credibility on which we must defer to the superior position of the chancellor.

Appellant also contends that the chancellor erred in holding that the transaction was exempt from the requirements of Federal Truth in Lending Laws. She makes no contention that the act applied insofar as C. J. Sims is concerned, or that the debt was not primarily a commercial one, as to him. It is her position that, in the absence of duress, undue influence and the promise of the loan of additional money, her mortgage of her separate property could only be attributable to her personal devotion to her husband and concern for his welfare. Because of this, she says that, so far as she was concerned, the transaction became one of consumer credit as defined by 15 USC 1602. Under that section, a consumer credit transaction is one in which the money, property or services which are the subject of the transaction are primarily for personal, family, household or agricultural purposes. Appellant contends that her position is that of an accommodation maker or surety, that the only service or benefit was to her husband and that there could be no more

personal or family purpose for entering into a transaction than saving one's husband from financial ruin.

Appellant relies upon *Cantrell* v. *First National Bank of Euless,* 560 S.W. 2d 721 (Tex. Civ. App., 1977). We find no similarity in that case and this, because the loan in *Cantrell* was made for the purchase of a motor home and the jury there specifically found that the purchase was not for business or commercial purposes and that there was no evidence that the motor home was acquired for anything other than the dwelling of the daughter and son-in-law of the borrower.

We agree with appellee, the chancellor, and the United States District Court for the Eastern District of Louisiana that it is the use of the money, property or services which is the subject of the underlying transaction, and not the nature of the property given as security, that controls. *Sapenter* v. *Dreyco, Inc.,* 326 F. Supp. 871 (1971), aff'd. per curiam 450 F. 2d 941 (5 Cir., 1971), cert. den. 406 U.S. 920, 92 S. Ct. 1775, 32 L. Ed. 2d 120; *Gerasta* v. *Hibernia National Bank,* 411 F. Supp. 176 (1976). Similarly, the subjective motivation of the mortgagor is not controlling.

The decree is affirmed.

HARRIS, C.J., not participating.