DEVAUX LEGRAND OWENS ET AL *v.* AMERICAN BANKERS
INSURANCE COMPANY

5-4176 413 S. W. 2d 663

Opinion delivered April 17, 1967.

*Walker, Jackson & Smith* and *Oliver L. Adams Jr.,*
for appellant.

*McMillen, Teague, Bramhall & Davis,* for appellee.

LYLE BROWN, Justice. This suit was brought by
plaintiffs-appellants against American Bankers Insur-

ance Company to cancel an insurance contract and obtain refund of premiums. The complaint was grounded in fraud. Complainants did not recover the full amount sought, and they appeal. The Insurance Company cross-appeals, relying principally on the defense of laches. The Company also contends that the trial court erred in finding it had breached the contract.

Dr. Owens one of the two appellants, purchased a policy of insurance from Equitable Investors Life Insurance Company in December 1948. The named insured was Dr. Owens' granddaughter, Mary Christine Johnston, and he was the beneficiary. The triple features of the policy are significant.

First the policy provided ordinary life coverage in the principal sum of $6,000.00.

Second, the Insurance Company set up a ''Mortality Endowment'' plan designated as a ''Primary Division.'' Under this feature the Company would place twenty-six policy holders in the ''Primary Division,'' and they would be numbered from one through twenty-six. In this instance Mary Christine Johnston, then two years of age, would be placed in a group of twenty-six persons of corresponding age. In the event of the death of any person in her division, Dr. Owens (as the owner of his granddaughter's policy) would receive a stated amount if at that time Mary's policy was the lowest numbered policy in her division. If it was not then the lowest numbered policy, she would move up to the next favored position, and so on until she was next in line for payment.

The third and final, feature of the policy was designated ''Secondary Division.'' This division worked similarly to the ''Primary Division,'' except that the names in these units worked in inverse order. In other words, those named in this group would progress downward to twenty-six instead of upward to number one position.

The important point to the investor (in this case Dr. Owens) was the filling of the various divisions by the Insurance Company. This could be accomplished only by the sale of similar policies to persons in the same age bracket as his granddaughter. American Bankers Insurance Company assumed this contract in June 1950. By 1952, the efforts of Equitable and the succeeding efforts of American Bankers had not filled any of the divisions. Because of lack of public demand American ceased selling this type of contract. Until that time Dr. Owens had annually received "Certificate of Advance in Position" of his granddaughter. The last of these notices was received in July 1953.

The abundant correspondence between Dr. Owens and American Bankers from 1953 until 1962 was introduced at the trial. In 1956 the doctor inquired about the advancements of his granddaughter in the various positions. He specifically asked whether this type policy was then being sold. Bankers' reply did not answer that question. Again, in 1959 Dr. Owens made further inquiry. For the first time he was advised that the endowment provisions would in time reach the point of no benefit. Bankers' statement read:

"There is one situation regarding these policies, Dr. Owens that you should know about. This type policy has not been sold for the past several years and naturally no additional members are being added to the divisions. Eventually, because of death, lapse, maturity by endowment, etc., these divisions will get down to where there will be only one person in them and the mortality endowment feature of the policy will not then be of benefit."

From 1959 through 1961 the correspondence reflects Dr. Owens' complete dissatisfaction with the policy. His first demand was for an equitable settlement. The only offer made was payment of cash surrender value ($144.00 as of 1959). During the succeeding years the doctor made repeated demands for settlement. He received the same answer as in 1959. In 1962 he referred

it to his attorney. The attorney's efforts were not successful, and suit was filed in December 1964.

During all these years Dr. Owens timely paid the premiums under protest, apparently in order to prevent forfeiture until such time as he could obtain what he considered an adequate settlement. In fact, he paid the premium due in 1964 into the registry of the court.

The holding of the chancellor was based on his finding that the insurance companies violated an implied obligation to in good faith continue to write the particular type of policy owned by Dr. Owens. From the testimony of an actuary it was determined that of the annual premium of $176.88, the sum of $78.88 was attributable to the cost of the endowment provisions. The balance of the premium represented the cost of the ordinary life provision. The chancellor awarded Dr. Owens judgment for $1,340.96, being that part of the premium payments attributable to the cost of the endowment provisions. This judgment was conditioned that the holder of the policy agree to a deletion of the endowment provision or forfeit the policy for its cash value. No attorney's fee was allowed. No interest on the premium payments ordered refunded was awarded.

We agree with the chancellor's finding that the sale of the policy to Dr. Owens carried an implied obligation on the part of the insurance company to in good faith endeavor to market this type of policy. The filling of the positions under the endowment provisions was vital to the operation of the plan. When efforts to sell this type of policy ceased before the positions were filled, good faith would dictate that such purchasers as Dr. Owens be forthwith notified. The principle adopted by the chancellor serves, generally, as a proper equitable basis for disposition of the case. However, we think equity dictates some modifications of his calculations. The reason for each such modification will be explained.

1. *Dr. Owens is not entitled to a refund of premiums he paid* in 1948, 1949, 1950, *and* 1951. The policy

was received December 21 1948. He carefully studied the policy. Some parts were not understandable, and he immediately wrote Equitable for information. He also advised that the insurance salesman assured him the granddaughter would have a preferred position in the divisions. From the correspondence it appears that the salesman, under instructions from Equitable, called on Dr. Owens with reference to his request for information. There was no further complaint registered with Equitable until December 1949. Dr. Owens received notice of the second annual premium. Dr. Owens protested that he had been assured by the salesman that there would be a pay-off under the endowment before the second premium came due. Equitable replied, calling the doctor's attention to the provisions of the policy. The company clearly indicated that the provisions of the policy governed, and not oral representations made by a salesman.

Equitable's position in this respect is strengthened by the application which Dr. Owens executed. Among other things it provided:

"I hereby agree: (1) that any statements, promises, or information made or given by or to the person soliciting or taking this application for policy or by or to any other person, shall not be binding on the Company or in any manner affect its rights unless such statements, promises, or information be reduced to writing and presented in this application to the home office of the Company; . . ."

Dr. Owens, a medical doctor, held important offices in the Arkansas Medical Society. He apparently had substantial business interests. In the field of insurance he has served on the board of directors of two insurance companies.

In view of these facts, along with the fact that the insurance companies were apparently endeavoring during these years to market this special policy, we hold it

would be inequitable to order refund of the premiums for these stated years.

2. *Dr. Owens is entitled to a refund of that part of all other premiums which were charged because of the endowment provisions.* American Bankers absorbed Equitable in 1950. American apparently sold this type of policy through 1952. The actuary testified that none of the endowment divisions had been filled to the maximum since the issuance of Dr. Owens' policy. He explained this was caused by lack of public demand. The fact that American Bankers had ceased marketing this type of policy was not made known to Dr. Owens until 1959, notwithstanding his repeated inquiries.

In this situation Dr. Owens was faced with a dilemma. One, he could forfeit the policy and collect the small cash value. Two, he could switch to a standard endowment policy which would likely not be payable during his lifetime. Three, could keep the present policy in force. Four, he could sue for recovery of premiums.

It is urged that Dr. Owens continued to keep the policy in force with full knowledge of the status of the endowment provisions, particularly after 1959. It is true he kept paying the premiums, but such payments were under considerable protest. He wrote seven letters to Bankers over a three-year period and before turning the matter over to his attorney. He emphatically explained his intention to recoup all premium payments and urged a settlement in lieu of litigation. We are impressed by the fact that during those years he was paying a premium for the endowment provisions, which were practically worthless. This condition was due to the fact that so few persons were in the groups with the granddaughter. In fact, the numbers in the respective groups ranged from a low of one to a high of five. To allow Bankers to retain premium monies chargeable to the endowment provisions would constitute unjust enrichment.

With respect to the ordinary life provisions in the

policy, the situation is different. Ordinary life coverage was afforded during these years. It would be inequitable in this case to hold that Bankers be required to refund the charge for that coverage. In situations where an insurance company has wrongfully repudiated a contract, premiums have been ordered refunded as damages. Here, the prime contract is, and always has been, in force.

American Bankers advances the defense of laches. Numerous cases on the subject are cited. Most of these cases are concerned with the requirement that the policyholder examine the policy and return it within a reasonable time. Otherwise, he is deemed to have accepted it and is liable for the premium obligation. The case before us does not fall in that category. For some seven years American Bankers had not lived up to its implied obligation to sell this type of policy—a fact that was not made known to Dr. Owens until 1959. By that time the doctor had invested over two thousand dollars in premiums. If he surrendered the policy, he would be paid $144.00 surrender value. If he accepted Bankers' offer to switch to a twenty-year endowment, he would probably not receive any benefit therefrom during his lifetime. Alternatively, he could pay premiums under protest to keep alive his chance to recoup a more substantial sum. The dilemma was created by American Bankers. Laches is an equitable defense. Before sustaining a defense of laches the court will take a long look at the facts to see if the pleader has in fact done equity.

American Bankers contends Dr. Owens could have sued for recovery of premiums in 1949 if he was not satisfied with the policy. It is then asserted he should have so acted in 1953 when he was writing to Bankers. But Bankers overlooks the fact that its letters to Dr. Owens during this period were reassuring. It was not until 1959 that Bankers revealed the truth.

But there is yet another, and stronger, reason for denying the defense of laches. To sustain that plea the

leader must show that the delay results in a disadvantage. No such disadvantage was suffered by Bankers.

> "Since laches is an equitable doctrine, its application is controlled by equitable considerations. It cannot be invoked to defeat justice; and it will be applied where, and only where, the enforcement of the right asserted would work injustice." 30A C. J. S. Equity § 115.

It should be noted that Bankers pleads the statute of limitations; however, it is not argued as a point for reversal. We therefore express no opinion in this respect.

We are reminded by appellants that this court cannot make a contract for the parties. This is correct; we can only construe and enforce contracts which have been made. The result of our decision will not have the effect of making a contract; we simply find that the endowment provisions of the insurance policy are so nearly worthless as to justify rescission and refund of premiums.

The chancellor made no allowance for an attorneys' fee. Appellants claim a fee under Ark. Stat. Ann. § 66-3239 (Repl. 1966). This statute, being penal in nature, must be strictly construed. Whether we treat this as a suit to recover premiums or to cancel the policy, the statute does not authorize an attorney's fee. See *American Republic Life Ins. Co.* v. *Claybough*, 227 Ark. 946, 302 S. W. 2d 545 (1957).

Dr. Owens is entitled to six per cent simple interest on his recovery, to be calculated from the date he made each payment.

Finally, we dispose of the question of the future status of the policy. The chancellor gave Dr. Owens the option of keeping the policy at a reduced premium and with the endowment provisions deleted, or of surrendering the policy upon receipt of the cash loan surrender value. We hesitate to approve this procedure, because it might be interpreted as making a contract between the parties. Since plaintiffs specifically prayed for can-

cellation and supported this prayer with testimony to the effect that they do not want the policy, we think it better to lay the matter at rest by directing surrender of the policy and payment by Bankers of the cash value.

Remanded with directions that the decree be modified to comport with this opinion.

WARD, J., would affirm the decree.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. I dissent from that part of the decision of this case which permits the recovery of premiums by Dr. Owens. The basis of my disagreement with the majority is the unreasonable and unexplained delay on his part in asserting his rights. He had full knowledge of all the facts and circumstances giving rise to his cause of action at the time of his receipt of appellee's letter of February 27, 1959. This is further evidenced by his own letter of March 4, 1959, in which he demanded a cash settlement and advised of his intention to try to collect from appellee. On March 20, 1959, Owens advised appellee that if he did not have a reasonable settlement offer in fifteen days, he would be forced to turn the matter over to his attorney. Yet, no suit was filed until December 18, 1964, well over five years later. During this time he continued to pay premiums annually, usually complaining about the situation at the time of each remittance. He periodically threatened suit. During this time appellee did nothing whatsoever to discourage appellant from bringing suit.

Whatever label may have been applied to the cause of action, it is for the rescission of a contract. Appellee specifically pleaded the statute of limitations and laches. I agree with the majority that the possible bar of the statute of limitations is no longer in issue, not having been listed as a point on which appellee relies or argued in its brief. Appellee does however, urge the defense of laches here. Regardless of the label given this defense, it relates to the staleness of appellants' demand on which appellants, not appellee, sought equitable relief.

In equity a stale demand is a form of laches. *Sullivant* v. *Sullivant*, 239 Ark. 953, 396 S. W. 2d 279.

This court considered the effect of lapse of time in *Davis* v. *Tarwater*, 15 Ark. 286, wherein rescission of a contract for the sale of lands was sought more than ten years after the date of the contract and more than five years after the discovery of the fraud alleged. In holding that a court of equity would refuse relief because of lapse of time where no excuse or explanation was offered for the delay, the court said that where one was guilty of negligence and slept on his rights, the best interests of society required that causes of action should not be deferred an unreasonable time. This court said that the objection that the claim is stale can be made at the hearing, or that the court might deny relief on its own motion when such a case is disclosed. It then said:

> "Lapse of time is not founded upon statutory provisions, though the statute may be referred to at fixing a reasonable time for its operation. The rule is applied by Courts on a broad view of all the circumstances of the case. And even in case where the demand is not barred by positive limitation, Courts of Equity refuse to interfere after a considerable lapse of time, from considerations of public policy and from the difficulty of doing entire justice. Nothing can call a Court of chancery into activity, but conscience, good faith, and reasonable diligence, and where these are wanting, the Court is passive and does nothing."

The principle was recognized and applied in *Jones* v. *Gregg*, 226 Ark. 595, 293 S. W. 2d 545, where this court held that an action to rescind a contract because of the failure of a seller for a period a little over two years to obtain a release of a vendor's lien which encumbered certain property sold to a buyer not to be timely. The court said:

> "While the law gave them the right to rescind the

agreement upon the failure of the appellants to comply with their part of the contract, this was only one of their remedies and they were not required to exercise it. The law does require, however, that in order to rescind a contract, the rescission itself must be made within a reasonable time after the facts giving rise to the right of rescission arise or become known; and, unless such right to rescission is exercised within reasonable time after the discovery of the facts justifying the rescission, the party otherwise entitled to rescind will be deemed to have waived this right."

Later, in *Koolvent Aluminum Awning Co. of Arkansas* v. *Johnson,* 231 Ark. 517, 331 S. W. 2d 265, the failure of a service station operator to assert a right to rescind for more than one year after work was completed on the installation of a canopy in front of his station was held to be an unreasonable delay amounting to a waiver of his right to rescind. It appeared that the operator complained that the materials used were not fireproof and of inferior grade, and that the canopy leaked, while the work progressed. There the operator had told workmen of the contractor to "tear it down and put it in the junkpile." With respect to this contention of the operator, this court said:

"***If this statement could be considered as notice to the seller of his election to rescind it must fail for the want of adhering to it since he permitted appellant to perform work on the contract after the statement without protest. The record reveals no affirmative act toward rescission was done by appellee until his answer was filed to the lawsuit which was more than a year after the work was completed. We hold that failure to assert the right to rescind for this period was an unreasonable delay which amounted to a waiver of the right to rescind, hence, the trial court was in error in decreeing rescission."

There are other cases wherein the failure to act

promptly in seeking relief from contracts, that have application here, even though the matter of rescission may not have been the actual issue involved. Among them are:

*Grayson-McLeod Lumber Co.* v. *Slack-Kress Tie and Stave Co.*, 102 Ark. 79, 143 S. W. 581, where it was said that it was the duty of one who discovered an apparent breach of a contract to insist upon a forfeiture at once if he intended to do so and that permitting the continued performance of the contract waived the breach.

*New York Life Ins. Co.* v. *Adams*, 151 Ark. 123, 235 S. W. 412, wherein it was held that an insurance company like a policyholder, waives the right to rescind a contract of insurance by failure to take advantage thereof within a reasonable time after discovery of the facts constituting grounds for rescission.

In *Newsum Auto Tire Vulcanizing Co.* v. *Shoemaker*, 173 Ark. 872, 294 S. W. 11, the failure to seek to rescind a release obtained by false representations and fraud for a period of more than two years after discovering the circumstances was held to be such an unnecessary delay as to constitute acquiescence and condonation of the fraud and a waiver of the right to rescind.

This is the basis of appellee's contention with reference to the defense of laches and I cannot agree that cases cited in its brief are inapplicable simply because they relate to failure of a policyholder to act promptly to reject an insurance policy not conforming to the agreement of the parties. The principle is the same and appellee appropriately argued this, in my opinion. *Remmel* v. *Griffin*, 81 Ark. 269, 99 S. W. 70, cited by appellee, is also cited by this court as authority for the holding in *New York Life Ins. Co.* v. *Adams*, 151 Ark. 123, 235 S. W. 412. Retention of a policy for more than three months was held to be such an unreasonable delay as would constitute a bar as a matter of law in *Carrigan*

v. *Nichols,* 148 Ark. 336, 230 S. W. 9. Delay of four months in bringing suit after obtaining actual knowledge of the contents of the policy was held to bar rescission in *Smith* v. *Smith,* 86 Ark. 284, 110 S. W. 1038. Delay of one year in repudiating a lease after lessee learned that he was induced to enter into it by fraudulent representations was held to be so unreasonable as to constitute waiver in *La Vasque* v. *Beeson,* 164 Ark. 95, 261 S. W. 49. [*New York Life Ins. Co.* v. *Adams, supra,* was cited as authority.] These cases were appropriately cited by appellee.

I would reverse on cross-appeal.