GRADDY S. DUNCAN AND MARGARETT LUCILLE DUNCAN, HIS WIFE *v.* JOYCE HENSLEY

5-5217                                    455 S. W. 2d 113

Opinion delivered June 15, 1970

*Thomas D. Ledbetter,* for appellants.

*Moore & Ligan,* for appellee.

EUGENE A. MATTHEWS, Special Chief Justice. This appeal is from the decree of the Newton County Chan-

cery Court cancelling a deed to Appellant Graddy S. Duncan, conveying 440 acres of real property situated in Newton County, Arkansas, and a bill of sale conveying to him certain personal property, both executed and delivered to this Appellant by. Appellee on February 4, 1969. The complaint of, the Appellee, Joyce Hensley, filed in the Newton Chancery Court on May 26, 1969 alleged that said instruments were executed as a result of threats of great bodily harm and injury to the plaintiff, and were without consideration, and prayed that the same be cancelled.

Appellee and Appellant Graddy S. Duncan (who will hereinafter be referred to as Appellant) were married September 16, 1964 at Kingsville, Georgia, while both were apparently residents of the State of Florida, and at a time when Appellee was conducting negotiations for the purchase of certain real estate known as the Long J Ranch in Covington, Louisiana. Thereafter the purchase was consummated, title being taken in the name of both Appellee and Appellant. The parties operated a ranching operation on these lands for approximately three years. The Louisiana lands were then sold for Seventy-nine Thousand ($79,000.00) Dollars, and a portion of the proceeds of the sale were used in purchasing the Newton County lands sometime during the latter part of 1967, in the purchase of a house trailer in which they lived upon the Newton County lands, and the Appellant and Appellee began a ranching operation upon such lands.

On June 26, 1968, the Appellee and Appellant entered into a property settlement agreement, in contemplation of divorce, under the terms of which Appellee was to receive the 440-acre farm located in Newton County, Arkansas, together with the household furniture located in Newton County, Arkansas, cattle and horses upon the Newton County farm and a 1968 Volkswagen automobile. The agreement recited that a 1961 Volkswagen registered in the name of Appellant would be transferred to Larry B. Hensley and further recited that any other automobiles, trucks or equipment

registered in the name of the husband should be his sole and exclusive property. On the same date, Appellant executed a quitclaim deed to Appellee covering the Newton County lands.

Thereafter, on August 1, 1968, Appellee was granted a divorce from the Appellant in which decree it was recited that the property settlement agreement filed therein should be approved and incorporated as a part of such decree. On February 4, 1969, Appellee, Joyce Hensley, executed and delivered to the Appellant a quitclaim deed conveying to him the Newton County lands and a bill of sale covering certain cattle, quarter horses, farm machinery, implements and tools situated on the Newton County lands and the house trailer, also situated thereon. The deed recited a consideration of Ten ($10.00) Dollars and other valuable consideration paid; and the bill of sale a consideration of Ten ($10.00) Dollars and other legal considerations paid. Both instruments were recorded on February 4, 1969.

On May 28, 1969, Appellee filed her suit to cancel these instruments and the decree from which this appeal comes was entered on September 4, 1969.

Appellants rely upon the following points for reversal:

I.

The Chancellor erred by allowing, over timely objection, testimony and evidence to be presented not related to issues contained in the pleadings, and further erred by allowing testimony and evidence to be presented going to issues, including relative assets of the parties, pre-dating August 1, 1968, when the divorce decree was entered.

II.

The Chancellor erred in finding clear and convincing evidence sufficient to decree cancellation of the

instruments involved herein on grounds of physical duress.

Point I. On the day set for trial of this case and after the parties had announced ready the Appellants, in response to an inquiry of the Court as to preliminary matters made the following motion:

"Yes, Your Honor, the original petition in the matter describes the two instruments that are involved in the case and we would like to have a ruling of the Court in advance; it is our feeling that the petitioners will attempt to introduce evidence that will not be germane to the questions of grounds for rescission of these two documents, and we would like to have the ruling of the Court to limit their scope of evidence."

In response to this motion the Court stated:

"We will pass on any objections that you have at the time any testimony is offered, and I will not try to anticipate anything that is going to be offered for purposes of clarification."

This ruling was correct upon the grounds stated by the Court. Thereafter the trial Court permitted evidence to be introduced going to the financial condition of the parties and the relationships existing between them prior to the divorce decree of August 1, 1968. Appellants argue that in response to their motion this testimony should have been excluded on the ground that the Court had lost jurisdiction over the subject matter and persons of the Appellee and the Appellant in the divorce action between them because the term in which such divorce decree was entered on August 1, 1968, had expired. They further argue that the Court erred in permitting testimony to be introduced related to facts and occurrences prior to February 4, 1969 under the doctrine of res judicata.

Neither of these arguments has merit. This litiga-

tion has nothing, whatever, to do with the divorce decree of August 1, 1968, except as the relationships between the parties prior to and at the time of such decree threw light upon the state of mind in which Appellee found herself on February 4, 1969, at the time of the execution of the instruments here in question. The issues in this action are not those embraced in the divorce action terminating in the August 1, 1968 decree and the doctrine of res judicata is not applicable in this case. Nor did the Court err in treating the pleadings in this cause as amended to conform to the proof, over the objection of Appellants. In the case of *Bonds* v. *Littrell,* 247 Ark. 577, 446 S. W. 2d 672, this Court held that when the trial court permits the introduction of evidence in the face of an objection that the point at issue was not raised by the pleadings, the effect of its ruling is to treat the pleadings as amended to conform to the proof. In so doing the Chancellor did not abuse his discretion.

Point II. Appellee was required to prove her case by clear, cogent and convincing testimony. *Bryan* v. *Thomas,* 226 Ark. 646, 292 S. W. 2d 552. In the case of *Hildebrand* v. *Graves,* 169 Ark. 210, 275 S. W. 524, this Court held that fraud may be proved by circumstantial evidence or by a combination of direct and circumstantial evidence. In the case of *Brimson* v. *Pearrow,* 218 Ark. 27, 234 S. W. 2d 214, this Court approved the following statement from the earlier case of *Hightower* v. *Nuber,* 26 Ark. 604, 611:

" 'And in a court of equity, where bad faith and unconscionable acts can have no allowance or favor, the strength of mental capacity of the parties, the circumstances surrounding them, their relationship, etc., make up the grounds upon which the court can find the real influences that produced the conveyance. And when it is discovered that the party in whose favor the conveyance was made possessed an undue advantage over the grantor, and in person, or by agent, exercised an improper influence over such one, and to the advantage of the

grantee, it is an act against conscience and within the cognizance of a court of equity.' "

We have no hesitancy in applying this same rule to this case where duress is alleged.

In *Burr* v. *Burton*, 18 Ark. 214, at page 233, this Court said:

"A contract made by a party, under compulsion, is void; because consent is of the essence of a contract, and where there is compulsion, there is no consent, for this must be voluntary. Such a contract is void for another reason. It is founded in wrong or fraud. It is not, however, all compulsion which has this effect; it must amount to duress. But this duress may be either actual violence, or threat. 1 Parsons on Cont. 319.

"The bill alleges, that Philip P. Burton threatened complainant, and the apprehension of personal violence was one of the inducements to the execution of the notes.

"Duress, by threats, says Mr. Parsons (Id. 320), exists not wherever a party has entered into a contract under the influence of a threat, but only where such a threat excites a fear of some grievous wrong, as of death, or great bodily injury, or unlawful imprisonment."

In *National Life & Accident Insurance Co.* v. *Blanton,* 192 Ark. 1165, 97 S. W. 2d 77, the rule in the Burton case was re-affirmed and was somewhat enlarged in the case of *Perkins Oil Company of Delaware* v. *Fitzgerald,* 197 Ark. 14, 121 S. W. 2d 877, where it is said:

"To the same effect were numerous cases cited and discussed, all of which we have examined and determined that they arrive at, or reach the same uniform conclusions as those wherein such contracts were fairly and openly entered into without fraud,

mistake, deception or any form of duress. They were ordinarily held to be good. But in those cases in which these contracts were induced by some form of fraud, by over-reaching, by deceptive promises, relied upon, or by some form of duress, sufficient under all the prevailing facts and circumstances to impair the deliberate judgment to the extent that it might be determined that although the contract had been signed, it had not been agreed to, such contracts have uniformly been held voidable at the instance of the injured party."

At the conclusion of the testimony, the trial Court made findings and in part said:

"The Court finds and holds that the evidence is clear and convincing that this defendant (Appellant) Graddy Duncan, came from Louisiana and approached this plaintiff (Appellee), on February 4, 1969, with the intention of depriving her of most of the rest of the assets that she had and more particularly this farm and most of the horses and such other items as she still owned, and that he went to her place of business and later threatened her life and finally by use of such threats, which the Court finds were direct and real and of such a nature as to place her in fear of grievous bodily wrong or even death, prevailed upon her to go with him to the office of a realtor and have these papers prepared conveying over to him all of the farm, and she was the sole owner at the time of this four hundred forty (440) acres of land and improvements on it, and these animals mentioned in the bill of sale or agreement that she executed on that date. The Court finds that since the instruments were executed under those circumstances and involuntarily and against her will that they should both be cancelled in their entirety, and the Court so decrees."

With these conclusions of the Chancellor, we agree.

The record of the testimony in this case is voluminous and it would serve no purpose to set it out in detail. It establishes that at the time of the marriage between Appellant and Appellee in 1964 the Appellee had assets approximating One Hundred Thousand Dollars and the Appellant had assets of less than Two Thousand Dollars, he having just a short time prior thereto delivered over all of his assets to a former wife in a divorce proceeding.

The evidence fairly establishes that after the 1964 marriage both of the parties devoted themselves to the ranching operation in Louisiana and later in Newton County; and that at the time of divorce on August 1, 1968 Appellant had made no financial contribution to the business operations of the parties other than his labor and participation in management.

Appellee testified that prior to February 4, 1969, she had seen the Appellant only on two occasions subsequent to August 1, 1968, the date of the divorce decree, these being times when he returned to Newton County to pick up items belonging to him, the last time being in November of 1968; that on the morning of February 4, 1969, the Appellant came to the office of the Boone County Veterinarian Clinic in Harrison, Arkansas, where she was employed and prevailed upon her to enter his truck for the purpose of talking with him and after accompanying her to the Post Office, drove toward Newton County and onto a dirt road where he stated that Appellee was going to sign everything over to him or she was going to be dead; that Appellant also made threats against the life of one Bill Hardin and his daughter who had accompanied her to work that day. She testified that in reaction to these statements she was very scared because she believed Appellant and as a consequence, agreed to sign the papers transferring the farm and the items described in the bill of sale over to Appellant. They then went to the real estate office of Al Hochberger, in Jasper, Arkansas, the real estate man who had sold them the 440-acre ranch, and he prepared the deed and bill of sale which were executed

and acknowledged in his presence, and thereafter by the parties taken on the same day to the Newton County Court House and made of record. Appellee further testified that while they were at the real estate office she made a list of the horses on the ranch to be used by Mr. Hochberger in preparing the deed and thereafter while the papers were being recorded Appellant wrote on this piece of paper the words "midnight, March 9, 1969" and told her that unless she was off the ranch by that date that she would be dead. She testified that when she returned to the veterinary office that she was very upset, hysterical and did not have very good control of herself.

Appellee testified she believed Appellant because she had seen him in violent rages specifically referring to an instance when he had beaten a horse in her presence and another time when he had threatened to kill the owner of a bull that had been permitted to get in with the cows on the Louisiana ranch; that this violence was demonstrated in a family argument that arose over the use of a television set; that prior to their marriage Appellant had told Appellee that if she didn't marry him no one else would and she considered this to be a threat. Mr. Hochberger testified that there was evidence that Appellee had been crying when she came into his office but that she made no oral objection to signing the papers; that the fact she appeared to have been crying did not give him too much concern because he had seen various cases where maybe the people are in disagreement but still they agree in the end and they are unhappy about it and he didn't pay too much attention to that at the time; that he was contacted several weeks later by Appellee and asked whether he could tell she was under duress at the time she signed the papers and he responded in the negative.

Larry Hensley, son of the Appellee, testified that he went to the veterinary clinic at about 4 o'clock in the afternoon of February 4, 1969, and that his mother was crying and seemed very nervous. He stated that later he was in Louisiana and talked over the telephone

with Appellant and that Appellant told him that if he saw him again after March 9th that he was dead. He testified that he had seen Appellant strike his twenty-one year old son, Stevie Duncan, and knock him to the ground, further stating the Appellee was present at the time this occurred; he testified that Appellant had made threats to hunters on the Newton County property and that this was known to Appellee on February 4, 1969. Appellant testified that he had struck his son saying he was giving him some backtalk and didn't shut up when he told him to. When asked if he had ever threatened Larry Hensley he said that he might have told him that he would tear him up with a halter or something like that.

Jane Dixon, a childhood friend of Appellee, testified as to various acts of the Appellant of a violent nature including the beating of the horse and an incident when Appellant threatened her and Appellee with a poker stating that all of these incidents were known to Appellee on February 4, 1969.

Appellant, in his testimony, corroborated some of the incidents occurring prior to February 4, 1969, but stated that he did not threaten his wife on that date. He testified that he came to Newton County on February 4, 1969, for the purpose of picking up the rest of his property specifically including a cattle van trailer, welding outfit, and other items, together with three cattle. He stated that he had previously discussed with Appellee his returning to pick these items up but that she was not expecting him on this date. He testified that he went to the veterinary clinic and picked up Appellee and that while they were at the Post Office he observed a 357 Magnum pistol in her purse. Appellee denied this. He said that they were riding around when he told her that he had come to pick up the trailer and had to have it in order to move his other stuff and when she said she didn't know where the trailer was, he told her that they would ride over and see the Sheriff of Newton County about it. In testifying with reference to the recording of the papers on Febru-

ary 4th, Appellant was asked on direct examination:

"Q. There has been some testimony about the fact her eyes might have been a little red or she might have been crying?

"A. Yes, she was crying. She was kind of huffed at me.

"Q. What do you mean by huffed at you?

"A. Well, I ought not to be so—there was so many cottonpicking people around and you couldn't talk to her; she was a good person but she is spoiled, whatever she wants that is what she wants and if you take it from her, you might as well take it away from Rastus Ramsey's baby that was back there a while ago (indicating in courtroom) because she don't like it."

Within a week after February 4, 1969, the date of the conveyances here sought to be set aside, Appellee went to the office of her attorney in the divorce proceeding, in Harrison, one Buford Gardner, who testified that Appellee wanted to get a peace bond or restraining order against the Appellant and at that time they discussed briefly his employment for the purpose of recovering the property forming the basis of this action, but that he advised her that if it was a criminal matter that she should go to the Prosecuting Attorney although it appeared that probably her best remedy would be a civil matter; that they then went to the office of the Prosecuting Attorney where she related the circumstances, and who declined to take any action without further investigation; that witness advised Appellee to wait to see what Mr. Dosier had told her about the matter and that possibly she should get her remedy in the civil action but that since he was deputy Prosecuting Attorney and had on occasion represented both of them recommended that she get other counsel. He further stated that she consulted him further and that

she was to get some other information for him and he was supposed to make a trip to Newton County to investigate it a little further; that at the same time they were discussing the matter of employing other counsel, that he wanted to avoid a conflict due to the fact there appeared to be some possibility that a criminal action might be involved. The certified copies of Exhibits A and B to Appellee's complaint, being the bill of sale and deed respectively, show that they were certified as true copies of the originals by the Newton County Circuit Clerk on February 12, 1969. This action was filed on May 28, 1969.

Appellants argue that even if the Court should determine that Appellee discharged the burden of proof as to establishing duress, and we have held she did, then she is estopped by reason of her failure to make known to any of the persons the parties contacted on February 4, 1969, that she was acting under duress of Appellant and by her further delay in asserting such duress until the filing of her complaint on May 28, 1969. Appellee testified that she continued under the burden of Appellant's threats until she left Newton County about March 8, 1969, and we do not find an unreasonable period of delay in filing the suit to set aside the instruments. In *Owens* v. *American Bankers Insurance Co.,* 242 Ark. 343, 413 S. W. 2d 663, this Court said:

"But there is yet another, and stronger, reason for denying the defense of laches. To sustain that plea the pleador must show that the delay results in a disadvantage. No such disadvantage was suffered by Bankers. 'Since laches is an equitable doctrine, its application is controlled by equitable considerations. It cannot be invoked to defeat justice; and it will be applied where, and only where, the enforcement of the right asserted would work injustice. 30 A. C. J. S. Equity, par. 115.' "

While we have made no attempt to summarize all of the testimony in this case, suffice it to say that after careful examination of the record we believe that,

within the rules set forth above, the competent testimony sustains the findings made by the Chancellor. While we find corroboration of Appellee's testimony on the issue of duress we also re-affirm our holding in the case of *Dodds* v. *Dodds,* 246 Ark. 307, 438 S. W. 2d 54, where it was stated:

> "Upon the issues still in dispute the testimony at the trial was in such conflict that the predominant question was that of credibility. Many of the contradictions were between W. P. Dodds on the one hand and either John or James on the other. Where the sole issue is that of credibility as between interested parties, our practice is to abide by the chancellor's judgment in the matter. *Souter* v. *Witt,* 87 Ark. 593, 113 S. W. 800, 128 Am. St. Rep. 40 (1908)."

Other arguments are raised by Appellants, all of which have been carefully considered and found to be without merit.

Affirmed; and the Appellee is allowed the full cost of printing her brief.

HARRIS, C. J., not participating.